UNITED STATES ET AL. *v.* MITCHELL ET AL.

No. 798.   Argued April 20, 1971—Decided June 7, 1971

BLACKMUN, J., delivered the opinion for a unanimous Court.

*William Terry Bray* argued the cause for the United States et al.   With him on the brief were *Solicitor General Griswold, Assistant Attorney General Walters, Matthew J. Zinn,* and *Crombie J. D. Garrett.*

*Paul K. Kirkpatrick, Jr.,* argued the cause and filed a brief for respondent Mitchell.   *Patrick M. Schott* argued the cause and filed a brief for respondent Angello.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

The petition here, arising from two cases below, presents the issue whether a married woman domiciled in the community property State of Louisiana is personally liable for federal income tax on half the community income realized during the existence of the community despite the exercise of her statutory right of exoneration. The issue arises in the context, in one case, of a divorce, and, in the other, of the husband's death.

## I

*Mrs.. Mitchell and Mrs. Sims:* The Commissioner of Internal Revenue determined deficiencies against Anne Goyne Mitchell and Jane Isabell Goyne Sims for the tax years 1955–1959, inclusive. These were for federal income tax and for additions to tax under § 6651 (a) (failure to file return), § 6653 (a) (underpayment due to negligence or intentional disregard of rules and regulations), and § 6654 (underpayment of estimated tax) of the Internal Revenue Code of 1954, 26 U. S. C. §§ 6651 (a), 6653 (a), and 6654. Mrs. Sims is the sister of Mrs. Mitchell. The determinations as to her were made under § 6901 as Mrs. Mitchell's transferee without consideration.

Anne Goyne and Emmett Bell Mitchell, Jr., were married in 1946. They lived in Louisiana. In July 1960, however, they began to live separately and apart. In August 1961 Mrs. Mitchell sued her husband in state court for separation. Upon his default, she was granted this relief. A final decree of divorce was entered in October 1962. In her separation suit Mrs. Mitchell prayed that she be allowed to accept the community of acquets and gains with benefit of inventory. However, taking advantage of the privilege granted her by Art. 2410 of the Louisiana Civil Code,[1] she formally renounced the community on September 18, 1961. As a consequence, she received neither a distribution of community property nor a property settlement upon dissolution of her marriage. This renunciation served to exonerate her of "debts contracted during the marriage."

---

[1] Art. 2410. "Both the wife and her heirs or assigns have the privilege of being able to exonerate themselves from the debts contracted during the marriage, by renouncing the partnership or community of gains."

Mrs. Mitchell earned $4,200 as a teacher during 1955 and 1956. From these earnings tax was withheld. Mr. Mitchell enjoyed taxable income during the five years in question. All income realized by both spouses during this period was community income.

Mrs. Mitchell had little knowledge of her husband's finances. She rarely knew the balance in the family bank account. She possessed a withdrawal privilege on that account, and occasionally exercised it. Her husband was in charge of the couple's financial affairs and did not usually consult his wife about them. She was aware of fiscal irresponsibility on his part. She questioned him each year about tax returns. She knew returns were required, but relied on his assurances that he was filing timely returns and paying the taxes due. She signed no return herself and assumed that he had signed her name for her. In July 1960 she learned that, in fact, no returns had ever been filed for 1955–1959.

The deficiencies determined against Mrs. Mitchell were based upon half the community income. The Commissioner sought to collect the deficiencies from property Mrs. Mitchell inherited from her mother in 1964 and immediately transferred, without consideration, to Mrs. Sims.

Mrs. Mitchell sought redetermination in the Tax Court. Judge Forrester held that under Louisiana community property law Mrs. Mitchell possessed an immediate vested ownership interest in half the community property income and was personally responsible for the tax on her share. He also ruled that this tax liability was not affected by her Art. 2410 renunciation. *Mitchell v. Commissioner*, 51 T. C. 641 (1969).

On appeal, the Fifth Circuit reversed, holding that by the renunciation Mrs. Mitchell avoided any federal income tax liability on the community income. *Mitchell*

v. *Commissioner*, 430 F. 2d 1 (CA5 1970).[2] Judge Simpson dissented on the basis of Judge Forrester's opinion in the Tax Court. 430 F. 2d, at 7.

*Mrs. Angello*. Throughout the calendar years 1959–1961 Mrs. Angello, who was then Frances Sparacio, lived with her husband, Jack Sparacio, in Louisiana. Community income was realized by the Sparacios during those years, but neither the husband nor the wife filed any returns. In 1965 the District Director made assessments against them for taxes, penalties, and interest, filed a notice of lien, and addressed a notice of levy to the Metropolitan Life Insurance Company, which had a policy outstanding on Mr. Sparacio's life. The insured died in March 1966 and the notice of levy (for that amount of tax and interest resulting from imputing to Mrs. Sparacio half the community's income for the tax years in question) attached to the proceeds of the policy. The widow, who was the named beneficiary, sued the Metropolitan in state court to recover the policy proceeds. The United States intervened to assert and protect its lien. The case was then removed to federal court. The Metropolitan paid the proceeds into the court registry and was dismissed from the case.

Each side then moved for summary judgment. Judge Christenberry granted the Government's motion and denied Mrs. Angello's. Despite the absence of any formal renunciation by Mrs. Angello under Art. 2410, the Government did not contend that she had accepted any benefits of the community. On appeal, the Court of Appeals reversed, relying on the same panel's decision in the *Mitchell* case. *Angello* v. *Metropolitan Life Ins. Co.*, 430 F. 2d 7 (CA5 1970). Judge Simpson again dissented.

---

[2] Accord, with respect to Texas law, *Ramos* v. *Commissioner*, 429 F. 2d 487 (CA5 1970).

We granted certiorari in both cases, 400 U. S. 1008 (1971), on a single petition filed under our Rule 23 (5).

## II

Sections 1 and 3 of the 1954 Code, 26 U. S. C. §§ 1 and 3, as have all of their predecessors since the Revenue Act of 1917,[3] impose a tax on the taxable income "of every individual." The statutes, however, have not specified what that phrase includes.

Forty years ago this Court had occasion to consider the phrase in the face of various state community property laws and of §§ 210 and 211 of the Revenue Act of 1926. A husband and wife, residents of the State of Washington, had income in 1927 consisting of the husband's salary and of amounts realized from real and personal property of the community. The spouses filed separate returns for 1927 and each reported half the community income. Mr. Justice Roberts, in speaking for a unanimous Court (two Justices not participating) upholding this tax treatment, said:

> "These sections lay a tax upon the net income of every individual. The Act goes no farther, and furnishes no other standard or definition of what constitutes an individual's income. The use of the word 'of' denotes ownership. It would be a strained construction, which, in the absence of further defini-

---

[3] Internal Revenue Code of 1939, §§ 11 and 12; Revenue Act of 1938, §§ 11 and 12, 52 Stat. 452, 453; Revenue Act of 1936, §§ 11 and 12, 49 Stat. 1653; Revenue Act of 1934, §§ 11 and 12, 48 Stat. 684; Revenue Act of 1932, §§ 11 and 12, 47 Stat. 174; Revenue Act of 1928, §§ 11 and 12, 45 Stat. 795, 796; Revenue Act of 1926, §§ 210 and 211, 44 Stat. 21; Revenue Act of 1924, §§ 210 and 211, 43 Stat. 264, 265; Act of March 4, 1923, 42 Stat. 1507; Revenue Act of 1921, §§ 210 and 211, 42 Stat. 233; Revenue Act of 1918, §§ 210 and 211, 40 Stat. 1062; Revenue Act of 1917, §§ 1 and 201, 40 Stat. 300, 303.

tion by Congress, should impute a broader signifi-. cance to the phrase." *Poe* v. *Seaborn*, 282 U. S. 101, 109 (1930).

The Court thus emphasized ownership. It looked to the law of the State as to the ownership of community property and of community income. It concluded that in Washington the wife has "a vested property right in the community property, equal with that of her husband; and in the income of the community, including salaries or wages of either husband or wife, or both." *Id.*, at 111. It noted that, in contrast, in an earlier case, *United States* v. *Robbins*, 269 U. S. 315 (1926), the opposite result had been reached under the then California law. But:

> "In the *Robbins* case, we found that the law of California, as construed by her own courts, gave the wife a mere expectancy and that the property rights of the husband during the life of the community were so complete that he was in fact the owner." 282 U. S., at 116.

In companion cases the Court came to the same conclusion, as it had reached in *Seaborn*, with respect to the community property laws of Arizona, Texas, and Louisiana. *Goodell* v. *Koch*, 282 U. S. 118 (1930); *Hopkins* v. *Bacon*, 282 U. S. 122 (1930); *Bender* v. *Pfaff*, 282 U. S. 127 (1930). In the Louisiana case it was said:

> "If the test be, as we have held it is,. ownership of the community income, this case is probably the strongest of those presented to us, in favor of the wife's ownership of one-half of that income." 282 U. S., at 131.

The Court then reviewed the relevant Louisiana statutes and the power of disposition possessed by each spouse. It noted that, while the husband is the manager of the affairs of the marital partnership, the limitations upon

the wrongful exercise of his power over community property are more stringent than in many other States. It concluded:

> "Inasmuch, therefore, as, in Louisiana, the wife has a present vested interest in community property equal to that of her husband, we hold that the spouses are entitled to file separate returns, each treating one-half of the community income as income of each 'of' them as an 'individual' as those words are used in §§ 210 (a) and 211 (a) of the Revenue Act of 1926." 282 U. S., at 132.

Two months later the Court arrived at the same conclusion with respect to California community propert_ law and federal income tax under the 1928 Act, with the Government conceding the effectiveness, in this respect, of amendments made to the California statutes since the *Robbins* decision. *United States* v. *Malcolm*, 282 U. S. 792 (1931). Significantly, the Court there answered in the affirmative, citing *Seaborn, Koch,* and *Bacon,* the following certified question:

> "Has the wife under § 161 (a) of the Civil Code of California such an interest in the community income that she should separately report and pay tax on one-half of such income?" 282 U. S., at 794.

This affirmative answer to a question phrased in terms of "should," not "may," clearly indicates that the wife had the obligation, not merely the right, to report half the community income.

The federal courts since *Malcolm* consistently have held that the wife is required to report half the community income and that the husband is taxable only on the other half. *Gilmore* v. *United States*, 154 Ct. Cl. 365, 290 F. 2d 942 (1961), rev'd on other grounds, 372 U. S. 39 (1963); *Van Antwerp* v. *United States*, 92 F. 2d 871 (CA9 1937); *Simmons* v. *Cullen*, 197 F. Supp. 179

(ND Cal. 1961); *Dillin* v. *Commissioner*, 56 T. C. 228 (1971); *Kimes* v. *Commissioner*, 55 T. C. 774 (1971); *Hill* v. *Commissioner*, 32 T. C. 254 (1959); *Hunt* v. *Commissioner*, 22 T. C. 228 (1954); *Freundlich* v. *Commissioner*, T. C. Memo. 1955–177; *Cavanagh* v. *Commissioner*, 42 B. T. A. 1037, 1044 (1940), aff'd, 125 F. 2d 366 (CA9 1942). There were holdings from the Fifth Circuit to this apparent effect with respect to Louisiana taxpayers. *Commissioner* v. *Hyman*, 135 F. 2d 49, 50 (1943); *Saenger* v. *Commissioner*, 69 F. 2d 633 (1934); *Smith* v. *Donnelly*, 65 F. Supp. 415 (ED La. 1946). See *Henderson's Estate* v. *Commissioner*, 155 F. 2d 310. (CA5 1946), and *Gonzalez* v. *National Surety Corp.*, 266 F. 2d 667, 669 (CA5 1959).

Thus, with respect to community income, as with respect to other income, federal income tax liability follows ownership. *Blair* v. *Commissioner*, 300 U. S. 5, 11–14 (1937). See *Hoeper* v. *Tax Comm'n*, 284 U. S. 206 (1931). In the determination of ownership, state law controls. "The state law creates legal interests but the federal statute determines when and how they shall be taxed." *Burnet* v. *Harmel*, 287 U. S. 103, 110 (1932); *Morgan* v. *Commissioner*, 309 U. S. 78, 80–81 (1940); *Helvering* v. *Stuart*, 317 U. S. 154, 162 (1942); *Commissioner* v. *Harmon*, 323 U. S. 44, 50–51 (1944) (DOUGLAS, J., dissenting); see *Commissioner* v. *Estate of Bosch*, 387 U. S. 456 (1967). The dates of the cited cases indicate that these principles are long established in the law of taxation.

## III

This would appear to foreclose the issue for the present cases. Nevertheless, because respondents and the Court of Appeals stress the evanescent nature of the wife's interest in community property in Louisiana, a review of the pertinent Louisiana statutes and decisions is perhaps in order.

Every marriage contracted in Louisiana "superinduces of right partnership or community of acquets or gains, if there be no stipulation to the contrary." La. Civ. Code Ann., Art. 2399 (1971). "This partnership or community consists of the profits of all the effects of which the husband has the administration and enjoyment, either of right or in fact, of the produce of the reciprocal industry and labor of both husband and wife, and of the estate which they may acquire during the marriage, either by donations made jointly to them both, or by purchase, or in any other similar way, even although the purchase be only in the name of one of the two and not of both, because in that case the period of time when the purchase is made is alone attended to, and not the person who made the purchase. . . ." Art. 2402. The debts contracted during the marriage "enter into the partnership or community of gains, and must be acquitted out of the common fund . . . ." Art. 2403. "The husband is the head and master of the partnership or community of gains; he administers its effects, disposes of the revenues which they produce, and may alienate them by an onerous title, without the consent and permission of his wife." Also "he may dispose of the movable effects by a gratuitous and particular title, to the benefit of all persons." Art. 2404. The same article, however, denies him the power of conveyance, "by a gratuitous title," of community immovables, or of the whole or a quota of the movables, unless for the children; and if the husband has sold or disposed of the common property in fraud of the wife, she has an action against her husband's heirs. At the dissolution of a marriage "all effects which both husband and wife reciprocally possess, are presumed common effects or gains . . . ." Art. 2405. At dissolution, "The effects which compose the partnership or community of gains, are divided into two equal portions

between the husband and the wife, or between their heirs . . . ." Art. 2406. "It is understood that, in the partition of the effects of the partnership or community of gains, both husband and wife are to be equally liable for their share of the debts contracted during the marriage, and not acquitted at the time of its dissolution." Art. 2409. Then the wife and her heirs or assigns may "exonerate themselves from the debts contracted during the marriage, by renouncing the partnership or community of gains." Art. 2410. And the wife "who renounces, loses every sort of right to the effects of the partnership or community of gains" except that "she takes back all her effects, whether dotal or extradotal." Art. 2411.

The Louisiana court has described and forcefully stated the nature of the community interest. In *Phillips* v. *Phillips*, 160 La. 813, 825–826, 107 So. 584, 588 (1926), it was said:

> "The wife's half interest in the community property is not a mere expectancy during the marriage; it is not transmitted to her by or in consequence of a dissolution of the community. The title for half of the community property is vested in the wife the moment it is acquired by the community or by the spouses jointly, even though it be acquired in the name of only one of them. . . . There are loose expressions, appearing in some of the opinions rendered by this court, to the effect that the wife's half interest in the community property is only an expectancy, or a residuary interest, until the community is dissolved and liquidated. But that is contrary to the provisions of the Civil Code . . . and is contrary to the rule announced in every decision of this court since the error was first committed . . . ."

Later, in *Succession of Wiener*, 203 La. 649, 14 So. 2d 475 (1943), a state inheritance tax case, the court, after referring to Arts. 2399 and 2402 of the Civil Code, said:

> "That this community is a partnership in which the husband and wife own equal shares, their title thereto vesting at the very instant such property is acquired, is well settled in this state . . . ."

> "The conclusion we have reached in this case is in keeping with the decision of the United States Supreme Court in the case of Bender v. Pfaff, supra, where that court recognized that under the law of Louisiana the wife is not only vested with the ownership of half of the community property from the moment it is acquired, but is likewise the owner of half of the community income. . . ." 203 La., at 657 and 662, 14 So. 2d, at 477 and 479.

After reviewing joint tenancy and tenancy by the entirety known to the common law, the court observed:

> "In Louisiana, the situation is entirely different, for here the civil law prevails, and the theory of the civil law is that the acquisition of all property during the marriage is due to the joint or common efforts, labor, industry, economy, and sacrifices of the husband and wife; in her station the wife is just as much an agency in acquiring this property as is her husband. In Louisiana, therefore, the wife's rights in and to the community property do not rest upon the mere gratuity of her husband; they are just as great as his and are entitled to equal dignity. . . . She is the half-partner and owner of all acquisitions made during the existence of the community, *whether they be property or income.* . . .

> "It is true that in weaving this harmonious commercial partnership around the intimate and sacred marital relationship, the framers of our law and its

codifiers saw fit, in their wisdom, to place the hus- band at the head of the partnership, but this did not in any way affect the status of the property or the wife's ownership of her half thereof. . . . And the husband was made the managing partner of the community and charged with the administration of its effects, as well as with the alienation of its effects and revenues by onerous title, because he was deemed the best qualified to act." 203 La., at 665–667, 14 So. 2d, at 480–481.

The court then outlined in detail the various protections afforded by Louisiana law to the wife and concluded:

"It is obvious, therefore, that the wife's interest in the community property in Louisiana does not spring from any fiction of the law or from any gift or act of generosity on the part of her husband but, instead, from an express legal contract of partnership entered into at the time of the marriage. There is no substantial difference between her interest therein and the interest of an ordinary member of a limited or ordinary partnership, the control and management of whose affairs has, by agreement, been entrusted to a managing partner. The only real difference is that the limitations placed on the managing partner in the community partnership are fixed by law, while those placed on the managing partner in an ordinary or limited partnership are fixed by convention or contract." 203 La., at 669, 14 So. 2d, at 481–482.

The husband thus is the manager and agent of the Louisiana community, but his powers as manager do not serve to defeat the ownership rights of the wife.

These principles repeatedly have found expression in Louisiana cases. *United States Fidelity & Guaranty Co.* v. *Green,* 252 La. 227, 232–233, 210 So. 2d 328, 330

(1968); *Gebbia* v. *City of New Orleans,* 249 La. 409, 415–416, 187 So. 2d 423, 425 (1966); *Azar* v. *Azar,* 239 La. 941, 946, 120 So. 2d 485, 487 (1960); *Messersmith* v. *Messersmith,* 229 La. 495, 507, 86 So. 2d 169, 173 (1956); *Dixon* v. *Dixon's Executors,* 4 La. 188 (1832).

This Court recognized these Louisiana community property principles in the Wiener estate's federal estate tax litigation. *Fernandez* v. *Wiener,* 326 U. S. 340 (1945). There the inclusion in the decedent's gross estate of the entire community property was upheld for purposes of the federal estate tax which is an excise tax. Mr. Chief Justice Stone noted the respective interests of the spouses when, in the following language, he spoke of the effect of death:

> "As we have seen, the death of the husband of the Louisiana marital community not only operates to transfer his rights in his share of the community to his heirs or those taking under his will. It terminates his expansive and sometimes profitable control over the wife's share, and for the first time brings her half of the property into her full and exclusive possession, control and enjoyment. The cessation of these extensive powers of the husband, even though they were powers over property which he never 'owned,' and the establishment in the wife of new powers of control over her share, though it was always hers, furnish appropriate occasions for the imposition of an excise tax.
>
> "Similarly, with the death of the wife, her title or ownership in her share of the community property ends, and passes to her heirs or other appointees. More than this, her death, by ending the marital community, liberates her husband's share from the restrictions which the existence of the community had placed upon his control of it. . . .

"This redistribution of powers and restrictions upon power is brought about by death notwithstanding that the rights in the property subject to these powers and restrictions were in every sense 'vested' from the moment the community began. . . ." 326 U. S., at 355–356.

Thus the Louisiana statutes and cases also seem to foreclose the claims advanced by the respondents.

IV

Despite all this, despite the concession that the wife's interest in the community property is not a mere expectancy,[4] and despite the further concession that she has a vested title in, and is the owner of, a half share of the community income,[5] respondents take the position that somehow the wife's interest is insufficient to make her liable for federal income tax computed on that half of the community income.

It is said that her right to renounce the community and to place herself in the same position as if it had never existed is substantive; that the wife is not personally liable for a community debt; that it is really the community as an entity, not the husband or the wife, that owns the property; and that Seaborn and its companion cases were concerned only with the right to split income, not with the obligation so to do. It is also said that the wife's dominion over the community property is nonexistent in Louisiana; that the husband administers the community's affairs as he sees fit; that he is not required to account to the wife, even for mismanagement, unless he enriches his estate at her expense by fraud; that she has no way to terminate the community other than by suit for separation, and then only

---

[4] Angello Brief 2.
[5] Angello Brief 2, 9.

by showing mismanagement on his part that threatens her separate estate; that her status is imposed by law, as contrasted with a commercial partnership where status is consensual; that she has no legal right to obtain the information necessary to file a tax return or to obtain the funds with which to pay the tax; and that *Robbins* authorizes taxing the whole of the community income to the husband. The same arguments, however, were advanced in *Seaborn,* 282 U. S., at 103–105, and in its companion cases, 282 U. S., at 119, 123, and 128, and were unavailing there, 282 U. S., at 111–113. They do not persuade us here. Specifically, the power to renounce, granted by Article 2410, is of no comfort to the wife-taxpayer. As Judge Forrester aptly expressed it, 51 T. C., at 646, Mrs. Mitchell's renunciation "came long after her liabilities for the annual income taxes here in issue had attached." Further, "[t]his right of the wife to renounce or repudiate must not be misconstrued as an indication that she had never owned and possessed her share, for that fact was not denied; but she did have, under the principles of community property, the right to revoke her ownership and possession. . . ." 1 W. deFuniak, Principles of Community Property § 218, p. 621 (1943).

The results urged by the respondents might follow, of course, in connection with a tax or other obligation the collection of which is controlled by state law. But an exempt status under state law does not bind the federal collector. Federal law governs what is exempt from federal levy.

Section 6321 of the 1954 Code imposes a lien for the income tax "upon all property and rights to property . . . belonging to" the person liable for the tax. Section 6331 (a) authorizes levy "upon all property and rights to property . . . belonging to such person . . . ." What is exempt from levy is specified in § 6334 (a). Section

6334 (c) provides, "Notwithstanding any other law of the United States, no property or rights to property shall be exempt from levy other than the property specifically made exempt by subsection (a)." This language is specific and it is clear and there is no room in it for automatic exemption of property that happens to be exempt from state levy under state law. *United States* v. *Bess,* 357 U. S. 51, 56–57 (1958); *Shambaugh* v. *Scofield,* 132 F. 2d 345 (CA5 1942); *United States* v. *Heffron,* 158 F. 2d 657 (CA9), cert. denied, 331 U. S. 831 (1947); Treas. Reg. § 301.6334–1 (c). See *Birch* v. *Dodt,* 2 Ariz. App. 228, 407 P. 2d 417 (1965). As a consequence, state law which exempts a husband's interest in community property from his premarital debts does not defeat collection of his federal income tax liability for premarital tax years from his interest in the community. *United States* v. *Overman,* 424 F. 2d 1142, 1145 (CA9 1970); *In re Ackerman,* 424 F. 2d 1148 (CA9 1970). The result as to Mrs. Mitchell and Mrs. Angello is no different.

It must be conceded that these cases are "hard" cases and exceedingly unfortunate for the two women taxpayers.[6] Mrs. Mitchell loses the benefit of her inheritance from her mother, an inheritance that ripened after the dissolution of her marriage. Mrs. Angello loses her beneficiary interest in her deceased husband's life insurance policy. This takes place with each wife not really aware of the community tax situation, and not really in a position to ascertain the details of the community income. The law, however, is clear. The taxes were due. They were not paid. Returns were not even filed. The "fault," if fault there be, lies with the four taxpayers and flows from the settled principles of the community prop-

---

[6] Of course, as Baron Rolfe long ago observed, hard cases "are apt to introduce bad law." *Winterbottom* v. *Wright,* 10 M. & W. 109, 116, 152 Eng. Rep. 402, 406 (1842).

erty system. If the wives were to prevail here, they would have the best of both worlds. .

The remedy is in legislation. An example is Pub. L. 91–679 of January 12, 1971, 84 Stat. 2063, adding to the Code subsection (e) of § 6013 and the final sentence of § 6653 (b). These amendments afford relief to an innocent spouse, who was a party to a joint return, with respect to omitted income and fraudulent underpayment. Relief of that kind is the answer to the respondents'. situation.

The judgment in each case is reversed.

*It is so ordered.*