702 F.2d 1288
 83-1 USTC P 9285
 UNITED STATES of America, Plaintiff-Appellee,
v.
Harry S. STONEHILL, Individually and as Trustee of the
Lourdes Blanco Stonehill Children's Trust, The
Elizabeth Anne Stonehill Trust, and The
Susan J. Stonehill Trust, et
al., Defendants-Appellants,
Trammell, Rand, Nathan & Lincoln, a Partnership, and Pacita
Carrion Brooks, Intervenors-Appellants.
 Nos. CA 80-4590, 80-4598, 80-4599 and 80-6062.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 22, 1982.
Decided April 8, 1983.
 
 Michael L. Paup, Kristina E. Harrigan, Dept. of Justice, Washington, D.C., Carleton D. Powell, Washington, D.C., for the U.S.
 James R. Moore, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., Trammell, Rand, Nathan & Lincoln, P.C., Washington, D.C., William W. Saunders, Honolulu, Hawaii, for appellants.
 Appeal from the United States District Courts for the Central and Northern Districts of California, and the District of Hawaii.
 Before CANBY, NORRIS and REINHARDT, Circuit Judges.
 CANBY, Circuit Judge:
 
 
 1
 The government initiated this action to foreclose income tax liens. After trial to the court, the district judge granted judgment in favor of the government. United States v. Stonehill, 420 F.Supp. 46 (C.D.Cal.1976). The taxpayers, their wives, their lawyers and certain other parties appeal.
 
 FACTS
 
 2
 Appellants Harry S. Stonehill and Robert P. Brooks (the taxpayers) are United States citizens who entered business in the Philippines after World War II. They settled in the Philippines and both married Filipino women. They prospered, eventually controlling many successful corporations and wielding great influence in Philippine politics.
 
 
 3
 In 1950, the taxpayers branched out into the cigarette manufacturing business by establishing the United States Tobacco Company (USTC). Their fortunes brightened considerably after 1958 when one of their companies obtained the first and only exclusive license (barter permit) to import American tobacco into the Philippines. For the license, the taxpayers made payments totalling ten million pesos (three million dollars at the black market exchange rate) to the ultimately victorious Philippine presidential candidate. The license gave the taxpayers a monopoly on Philippine sales of American tobacco, which consumers greatly preferred. USTC, controlled and largely owned by the taxpayers, was the principal beneficiary of the license. USTC bought the American tobacco and manufactured cigarettes for sale in the Philippines.[1] In the first fourteen months after the acquisition of the license, USTC's share in the Philippine cigarette market increased by some 1500% (from a 3.7% share to 58%).
 
 
 4
 The district court found that, between 1958 and 1961, millions of dollars from various Philippine business dealings passed through the taxpayers' hands. Much of this money came from illegal and unrecorded sources.[2] The taxpayers extracted commissions and rebates from exporters and shippers of the American tobacco. They received kickbacks from Philippine manufacturers who were permitted to buy imported tobacco, and they siphoned off large sums from USTC and other controlled corporations. Neither the corporate books nor the taxpayers' individual records reflected these transactions. Over nine million dollars flowed through black market channels to secret Swiss bank accounts and "shell" companies. Some of this money paid expenses of USTC in the United States.[3] About four million of these dollars were invested in American real estate and securities. During these years the taxpayers reported combined incomes of less than $200,000.
 
 
 5
 In about 1960, both American and Philippine officials became interested in the taxpayers' activities. The United States State Department believed that Stonehill was a corrupt influence on the Philippine government and wanted to get him out of that country.[4] Consequently, the United States Internal Revenue Service began to investigate the taxpayers' affairs.
 
 
 6
 On March 3, 1962, some 200 agents of the Philippine National Bureau of Investigation raided the offices of the taxpayers and seventeen of their corporations. The agents illegally seized thirty-five truckloads of documents. Representatives of the United States Internal Revenue Service were permitted to examine these documents, and over 35,000 were eventually copied by the Internal Revenue Service.[5] A three year, worldwide audit ensued. More than fifty revenue agents audited some twenty-five business entities in the United States, the Philippines, Hong Kong, Australia, Japan, Canada, France, England and Germany. Because the taxpayers' records did not accurately reflect income, the Commissioner used the audit information to estimate unreported income by calculating the increase in the taxpayers' net worth. The Commissioner computed tax deficiencies (including interest and penalties) of $13,613,721.51 against Stonehill and $11,182,966.73 against Brooks.
 
 
 7
 Fearing that the taxpayers, if given time, would try to remove their assets from this country, the Commissioner issued "jeopardy" assessments pursuant to 26 U.S.C. Sec. 6861 against the taxpayers on January 18, 1965.[6] Section 6861 permits the Commissioner to issue an assessment without first sending the usual notice of deficiency (90 day letter) when collection would be "jeopardized by delay." The filing of the jeopardy assessments created tax liens on the property of the taxpayers. 26 U.S.C. Sec. 6321.[7] One week later, the United States commenced these actions to foreclose tax liens on certain of the taxpayers' properties in the United States.[8]
 
 
 8
 Years of litigation ensued, involving hundreds of depositions all over the world, dozens of hearings, and three successive judges. Resolution was complicated by the absence of crucial documents and witnesses (including the taxpayers themselves), by sensitive diplomatic and political considerations, and by many charges of misconduct made by both sides. In 1967, the taxpayers made a motion to suppress the evidence illegally seized in the Philippine raids. The district court concluded that the United States had not instigated or participated in the illegal searches and denied the motion. 274 F.Supp. 420 (S.D.Cal.1967). We affirmed. 405 F.2d 738 (1968), cert. denied, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969).
 
 
 9
 After pre-trial hearings in 1974, the government conceded that half of the taxpayers' income constituted income to their wives under Philippine community property laws. The wives are not subject to United States income taxation. Therefore, the amount of tax assessed against the taxpayers was halved.
 
 
 10
 Ten years after the action commenced, on May 27-30, 1975, it was tried before Judge Solomon. The government introduced many documents and depositions to prove fraud. To support the asserted tax deficiencies, however, the government introduced only the jeopardy assessments. The government thus chose to rely on the presumption that the assessments are correct, rather than proving each item of the underlying net worth computations. The jeopardy assessments themselves contained only bare assertions of tax due plus interest and penalties in each of the four years. Apparently by oversight, the net worth computations were never put into evidence at all.
 
 
 11
 The district court upheld the validity of the tax liens. The court adjusted the assessments to correct the treatment of the ten million peso bribe, and to reflect the conceded community property split. Although these adjustments greatly reduced the assessments, the district court held that the taxpayers had not rebutted the presumption of correctness. The district judge also rejected the wives' claim that the tax liens did not encumber their community half interest in the properties. United States v. Stonehill, 420 F.Supp. 46 (C.D.Cal.1976).
 
 
 12
 After the main trial, Trammell, Rand, Nathan and Lincoln (TRNL), the lawyers representing the taxpayers, intervened to foreclose liens securing legal fees against some of the properties subject to litigation. The district judge rejected their claim, ruling that the TRNL's rights were ineffective against or inferior to the government's tax liens.
 
 Four groups of defendants appeal:
 
 13
 (1) The taxpayers, Harry S. Stonehill and Robert P. Brooks, appeal the finding of tax liability.
 
 
 14
 (2) Their wives, Lourdes Blanco Stonehill and Pacita C. Brooks, appeal the decision that the liens encumber their community property interest in the properties.
 
 
 15
 (3) Trammell, Rand, Nathan and Lincoln, the law firm that defended the taxpayers, appeals the district court's ruling that any liens for attorneys' fees that they have upon these properties are invalid against the government.
 
 
 16
 (4) Finally, certain third parties appeal the judgment on the ground that it extinguished their interests in the property without their having an opportunity to litigate the issue.
 
 I. Tax Liability
 
 17
 In the trial to foreclose tax liens, the government produced no evidence on the amount of tax liability, but chose instead to rely upon the presumption of correctness which applied to the assessments of tax. The taxpayers contend that the district court erred in awarding judgment on the basis of the presumption. They argue that the presumption never arose, or was destroyed by the substantial errors in the original assessments.
 
 A. Factual Foundation for the Assessments
 
 18
 In an action to collect tax, the government bears the burden of proof. The government can usually carry its initial burden, however, merely by introducing its assessment of tax due. Normally, a presumption of correctness attaches to the assessment, and its introduction establishes a prima facie case. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); United States v. Molitor, 337 F.2d 917, 922 (9th Cir.1964). The presumption does not arise unless it is supported by a minimal evidentiary foundation. Weimerskirch v. Commissioner, 596 F.2d 358, 360 (9th Cir.1979). The taxpayers contend that the assessments here were not entitled to the presumption of correctness because they lacked any factual foundation.
 
 
 19
 The factual foundation for the assessment is laid "once some substantive evidence is introduced demonstrating that the taxpayer received unreported income." Edwards v. Commissioner, 680 F.2d 1268, 1270 (9th Cir.1982) (per curiam). Accord Weimerskirch v. Commissioner, 596 F.2d 358, 360 (9th Cir.1979); United States v. Janis, 428 U.S. 433, 441-42, 96 S.Ct. 3021, 3025-26, 49 L.Ed.2d 1046 (1976); Suarez v. United States, 582 F.2d 1007, 1010 n. 3 (5th Cir.1978); Carson v. United States, 560 F.2d 693, 696-98 (5th Cir.1977); Gerardo v. Commissioner, 552 F.2d 549, 552 (3d Cir.1977). In Weimerskirch, the government assessed deficiencies based on allegedly unreported income from the sale of heroin. The government offered no evidence, however, showing that Weimerskirch had ever sold any heroin, or that he had received any unreported income. 596 F.2d at 361-62. This court held that the Commissioner was not entitled to rely solely on the presumption of correctness. Here, in contrast, overwhelming evidence demonstrated that the taxpayers had received millions of dollars of unreported income from their Philippine and American businesses. Between 1959 and 1962, more than nine million dollars flowed into secret Swiss bank accounts belonging to the taxpayers. The taxpayers acquired over four million dollars worth of property and securities in the United States with money from these Swiss accounts. During these years, the taxpayers reported income totalling only $200,000. The assessments thus stood securely upon a foundation of concrete evidence; the presumption of correctness was applicable.
 
 
 20
 The taxpayers next argue that this foundation evidence was admitted solely on the issue of fraud and cannot be used to support the presumption. This argument too narrowly restricts the ruling of the trial judge. He explained the permissible use of the evidence: "The Government may rely on any evidence to defend the integrity of the Commissioner's determination against the taxpayers' attacks. The Government may not, however, rely on evidence admitted on the issue of fraud to prove specific items of tax liability." 420 F.Supp. at 57 n. 10. The district judge was concerned that the government might abandon its reliance upon the presumption of correctness by trying to prove and total up many individual items of tax liability. The government is not doing that here. To "defend the integrity" of the assessments comprehends supplying the necessary factual basis to show that they are not utterly without foundation. The use of the fraud evidence by the district judge himself reinforces this interpretation. The district judge used the fraud evidence in deciding that the taxpayers' records were inadequate, id. at 55 n. 9, and in showing a likely source of income to justify the use of the net worth method, id. We are satisfied that the district court's admission of the fraud evidence was not so restricted as appellants contend, and that it is available to supply the Weimerskirch factual foundation.
 
 
 21
 We conclude the district court properly held that the presumption of correctness applied to the assessments.
 
 B. Taxpayers' Rebuttal of the Presumption
 
 22
 The taxpayers contend that they successfully rebutted the presumption of correctness by demonstrating substantial errors in the assessments.
 
 
 23
 Introduction of the presumptively correct assessment shifts the burden of proof to the taxpayer. United States v. Molitor, 337 F.2d 917, 922 (9th Cir.1964). If the taxpayer rebuts the presumption, it disappears. In a suit to collect tax on unreported income, the burden of proving the deficiency then reverts to the government. Herbert v. Commissioner, 377 F.2d 65, 69 (9th Cir.1967); 9 Mertens, Law of Federal Income Taxation Sec. 49.218 (1976).
 
 
 24
 To rebut the presumption of correctness, the taxpayer has the burden of proving that the assessment is "arbitrary or erroneous." Helvering v. Taylor, 293 U.S. 507, 515, 55 S.Ct. 287, 291, 79 L.Ed. 623 (1935); Cohen v. Commissioner, 266 F.2d 5, 11 (9th Cir.1959). Where an assessment is based on more than one item, the presumption of correctness attaches to each item. Proof that an item is in error destroys the presumption for that single item; the remaining items retain their presumption of correctness. Clark v. Commissioner, 266 F.2d 698, 707 (9th Cir.1959); Hoffman v. Commissioner, 298 F.2d 784, 788 (3d Cir.1962); Foster v. Commissioner, 391 F.2d 727, 735 (4th Cir.1968); Anderson v. Commissioner, 250 F.2d 242, 246 (5th Cir.1957); Banks v. Commissioner, 322 F.2d 530, 538 (8th Cir.1968). Even where the assessment has separable items, however, error which demonstrates a pattern of arbitrariness or carelessness will destroy the presumption for the entire assessment. Hoffman v. Commissioner, 298 F.2d 784, 788 (3d Cir.1962). See Gasper v. Commissioner, 225 F.2d 284, (9th Cir.1955); Cohen v. Commissioner, 266 F.2d 5 (9th Cir.1959); Thomas v. Commissioner, 223 F.2d 83 (9th Cir.1955).
 
 
 25
 Here, two "errors" reduced the assessments by about sixty percent: the pretrial concession that half of the conjugal income was not taxable to the taxpayers, and the trial court's decision that the ten million peso bribe should be treated as a business expenditure.[9] The district court held that the presumption of correctness applied to the remaining parts of the assessment, and that the errors did not show arbitrariness. These factual determinations of the district court will not be overturned unless they are "clearly erroneous." Weimerskirch v. Commissioner, 596 F.2d 358, 359-60 (9th Cir.1979).
 
 
 26
 The taxpayers contend that the "multiple items" doctrine could not apply here, for these assessments contained no separable items but only solitary assertions of tax due in each year. Thus, they say, the errors left no "unaffected parts" to which the presumption could adhere. This argument fails, however, for the parts need not be delineated in the assessment itself. In Clark v. Commissioner, 266 F.2d 698 (9th Cir.1959), we held that error in one separable item did not infect the entire assessment. The parts in that case were not separately set forth in the assessment itself, but in a report prepared by a government agent. Id. at 705 & 707. Accord, Banks v. Commissioner, 322 F.2d 530, 538 (8th Cir.1968). Thus, in the present case, the multiple items could be supplied by the net worth calculations underlying the assessments. Reliance upon the net worth computations is complicated by the government's failure to put them into evidence. In this case, however, the taxpayers admit that they received the net worth calculations in their notices of deficiency. They actually attacked several individual items of the calculations, and showed that the Commissioner had erroneously excluded the ten million peso bribe from their opening net worth. Attorneys for both sides, on the record, made repeated references to the net worth calculations and the numerous items of which they were comprised.[10] In these circumstances, the district judge correctly ruled that the assessments were based upon multiple items, and that the presumption continued to apply after the adjustments.
 
 
 27
 The taxpayers have also failed to prove that the errors demonstrate a pattern of arbitrariness. Gasper v. Commissioner, 225 F.2d 284 (9th Cir.1955), presents the kind of pervasive arbitrariness that can taint the entire assessment. There, the Commissioner used the "mark-up" method to determine income for a small pub. The Tax Court found, however, that the number of bottles consumed during the year was known, as were the various prices per drink and number of drinks per bottle. A simple calculation could accurately determine income, yet the Commissioner adopted a method which appeared to bear only a slight relationship to actual income. For one class of liquor the mark-up method overstated income by more than fifty percent. Id. at 285. Thus, the method chosen was unnecessarily crude. All of the resulting assessments were infected by this fundamental error; no presumption could survive.
 
 
 28
 Neither of the errors here shows the arbitrariness displayed in Gasper. Whether the taxpayers were taxable on all of their business income or (as ultimately proved to be the case) on only half presented a difficult question of Philippine law. Experts differed. The taxpayers themselves failed to make community property claims on their returns. In these circumstances, the government's pre-trial concession of this unclear legal point does not cast doubt upon the other items underlying the assessment, nor show carelessness. See Gobins v. Commissioner, 18 T.C. 1159, 1169 (1952), aff'd per curiam, 217 F.2d 952 (9th Cir.1954); Silverman v. Commissioner, 538 F.2d 927, 930-31 (2d Cir.1976). The district judge was correct in finding that this error did not destroy the presumption.
 
 
 29
 Similarly, the Commissioner's classification of the ten million peso bribe as a personal expenditure, although error, was reasonable. The payment was illegal and was not reflected in the records of any of the taxpayers' corporations. The money apparently came from the taxpayers' personal funds. The mistaken treatment of this payment did not demonstrate a pattern of pervasive arbitrariness that could infect the entire assessment.
 
 
 30
 These conclusions are buttressed by the nature of this case. The Commissioner was forced to use the imprecise net worth method of estimating income because the taxpayers' records were unreliable and did not accurately reflect income. 420 F.Supp. at 55. Some error is unavoidable in such a reconstruction. Banks v. Commissioner, 322 F.2d 530, 548 (8th Cir.1963). Errors arising from the taxpayers' attempts to conceal their income will rarely rebut the overall presumption of correctness. Skillful concealment must not raise an insurmountable barrier to proof. United States v. Johnson, 319 U.S. 503, 518, 63 S.Ct. 1233, 1240, 87 L.Ed. 1546 (1943).
 
 
 31
 The district judge was correct in holding that the assessments, after adjustment to reflect necessary changes, continued to carry the presumption of correctness. Because the taxpayers failed to discharge their burden of rebutting the presumption, the tax liability was established.
 
 C. Other Contentions
 
 32
 The taxpayers contend that the use of the net worth method was improper. The net worth method is acceptable only if the taxpayers' records do not accurately reflect income. Holland v. United States, 348 U.S. 121, 125, 75 S.Ct. 127, 130, 99 L.Ed. 150 (1954). Here, taxpayers caused millions of unrecorded dollars to be deposited in Swiss bank accounts. Any contention that the taxpayer's records accurately reflected income is frivolous. Use of the net worth method here was proper.
 
 
 33
 The taxpayers next argue that the government may have abandoned the presumption of correctness by switching to a theory of constructive dividends. Such a change of legal theory may destroy the presumption that the assessments were correct. Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 57 S.Ct. 569, 81 L.Ed. 755 (1937). The government's constructive dividend theory, however, was not a change from the net worth method, but an integral part of it. Some of the money from the Swiss accounts was used to pay expenses of USTC in America. In calculating the taxpayers' closing net worth, the government treated these payments as capital contributions to USTC, and therefore as evidence of taxable income. The taxpayers attacked this allocation, arguing that the money represented USTC earnings in the Philippines used to pay USTC expenses in the United States. Thus, the taxpayers argued that these increases in net worth were not yet taxable to them. See United States v. Smith, 418 F.2d 589, 593 (5th Cir.1969); Ireland v. United States, 621 F.2d 731, (5th Cir.1980) (a constructive dividend must advance the shareholder's personal, not business interest). The government replied that while in the Swiss accounts, the money was under the sole control of the taxpayers. The money thus amounted to constructive dividends to them from their corporations, and was income. Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 336, 74 L.Ed. 916 (1930); Hartman v. United States, 245 F.2d 349, 352-53 (8th Cir.1957). So employed, the constructive dividend theory was merely an underlying part of the government's net worth case. Reliance on this sub-theory does not defeat the presumption.
 
 
 34
 The taxpayers also complain that, although they were ready to attack specific items of the net worth computations, they were unable to do so because the figures were never put into evidence. The absence of these calculations, they contend, made it unfairly difficult for them to carry their burden of proving the assessment arbitrary or erroneous.
 
 
 35
 The taxpayers' protestations of unfairness, however, fly in the face of the record. The taxpayers admit that they received notices of deficiency which set forth the net worth calculations. The taxpayers deposed a government agent regarding the net worth statements and in 1972 received detailed requests for admissions concerning the net worth computations. Their own counsel repeatedly referred to the large number of items comprised in the calculations. Finally, the taxpayers actually attacked several individual elements of the net worth calculations: the cash on hand in the opening net worth, the government's failure to include the ten million peso payment as an asset in their opening net worth, the original value of stock in USTC, and the inclusion in the closing net worth of payments from the Swiss accounts for the benefit of USTC in the United States. The district court agreed with their argument concerning the ten million peso payment. 420 F.Supp. at 59.
 
 
 36
 Fairness may indeed require that the taxpayer know the basis for an assessment. We certainly do not recommend that the government refrain from putting its net worth computations into evidence. Nevertheless, the taxpayers here knew each detail of the calculations. Under these circumstances, no substantial unfairness resulted from the failure to introduce the computations into evidence.
 
 
 37
 Finally, the taxpayers argue that the judgment assumes certain matters that are not supported by the record: for example, the amount of long-term capital gain, the amount of dividends received credit, and whether the ten million peso bribe was made with separate or community property funds. This argument is not well-founded. The assumptions of capital gains and dividends credit were used in making the assessment and so are presumptively correct. The taxpayers have not carried the burden of proving them wrong. The fifty-fifty split made by the district court in allocating the community property interest was reasonable in the absence of other indications; the taxpayers have not shown it to be incorrect. The judgment thus rests securely on the prima facie case created by the assessments.
 
 
 38
 We therefore hold that the presumption of correctness applied to those assessments and was not rebutted. The judgment of tax liability is accordingly affirmed.
 
 II. Community Property Interests
 
 39
 The realty covered by the government's tax liens is community property. The parties agree that the nature and extent of the husband's interests in the properties is governed by Philippine law. Taxpayers' wives contend that under Philippine law and the Internal Revenue Code the tax liens cannot apply to more than their husbands' half interests in the property. The district court rejected this argument and the wives appeal.
 
 
 40
 Under Philippine law, income from the husbands' businesses was conjugal property[11] in which the wife had an immediate vested half interest. Philippine Civil Code Ann. Art. 153 (1971). The taxpayers are taxable only on their half of the community income. Rev.Rul. 269, 1956-1 C.B. 318; United States v. Mitchell, 403 U.S. 190, 197, 91 S.Ct. 1763, 1768, 29 L.Ed.2d 406 (1971). The wives are neither citizens nor residents of the United States and so are not subject to United States income tax.
 
 
 41
 The government concedes that it cannot tax the wives on their half of the conjugal income. The issue here is whether tax liens arising from properly assessed deficiencies on the husbands' half of the income can be foreclosed against all of the conjugal property.
 
 
 42
 Philippine law provides that the conjugal property is liable for certain debts of the husband. Article 161 of the Philippine Code provides: "The conjugal partnership shall be liable for (1) all debts and obligations contracted by the husband for the benefit of the conjugal partnership ...." Generally, obligations incurred in the course of a trade or business are for the benefit of the community. Luzon Surety Co. v. DeGarcia, 30 S.C.R.A. 111, 115 (Phil.1969). In certain unusual circumstances, where the community received no actual benefit, business obligations have been held to fall beyond the scope of article 161. Id. (husband received no consideration for standing as surety on a debt); Laperal v. Katigbak, 104 Phil. 999, 1004-05 (1958) (spouses separated and wife no longer received any of the business income). Here, the wives undeniably received the benefits of their husbands' business income; the tax obligations were incurred to benefit the community.
 
 
 43
 The wives argue that, although they received income from their husbands' businesses, they received no benefit from the attachment of the tax liens. This argument ignores the reality of this transaction. The income and tax were not two unrelated transactions; rather they are aspects of a single transaction. The wives can no more retain the benefit of earnings while avoiding the non-beneficial taxes than they could retain a loan while avoiding the non-beneficial obligation of a promissory note. See Laperal v. Katigbak, 104 Phil. at 1004; Javier v. Osmena, 34 Phil. 336 (1916).
 
 
 44
 Second, the wives contend that their husbands lack any property interest in the wives' half of the property to which the tax liens can attach.
 
 
 45
 Pursuant to 26 U.S.C. Sec. 6321 (1967), a lien for unpaid taxes arises upon "all property and rights to property, whether real or personal, belonging to such person."[12] Local law, here Philippine, determines whether the taxpayer has "rights to property" to which the tax lien may attach. See Morgan v. Commissioner, 309 U.S. 78, 80, 60 S.Ct. 424, 425, 84 L.Ed. 585 (1940); Runkel v. United States, 527 F.2d 914 (9th Cir.1975). Because the tax deficiencies were assessed only against the husbands, the tax liens under Section 6321 can encumber only property in which the husbands have some right. The wives contend that their husbands have no property rights in the wives' half of the conjugal property, and that the tax liens therefore cannot extend to more than the husbands' half of the conjugal properties.
 
 
 46
 For support, the wives cite United States v. Overman, 424 F.2d 1142 (9th Cir.1970); Ackerman v. United States, 424 F.2d 1148 (9th Cir.1970), and Commissioner v. Cadwallader, 127 F.2d 547 (9th Cir.1942). None of these cases, however, is controlling.
 
 
 47
 In both Overman and Ackerman, state law prevented a husband's premarital creditors from reaching any of the community property. The government nevertheless attempted to foreclose premarital tax liens against the community property. The wives argued that the husbands lacked a separate property interest in any of the community property to which a premarital tax lien could attach. Overman, 424 F.2d at 1145; Ackerman, 424 F.2d at 1149. We held that Sec. 6321 overrode the state creditor exclusion and that the husband had a sufficient property right in his undivided one half interest in the community property for the assertion of tax liens. Overman, 424 F.2d at 1146; Ackerman, 424 F.2d at 1150.
 
 
 48
 Thus, Overman and Ackerman extended the reach of premarital tax liens to half of the community property even when state law insulated the community property from premarital creditors generally. In the present case, in contrast, Philippine law (article 161) permits the liens to reach all of the conjugal property. Nothing in Overman or Ackerman reduces the reach of the tax liens below what local law permits.
 
 
 49
 In Commissioner v. Cadwallader, 127 F.2d 547 (9th Cir.1942), we considered the application of federal estate taxes to an American couple living in the Philippines. When the husband died, we held that "for the purpose of the federal estate tax the husband must be held to have no interest in the wife's share of the conjugal estate." Id. at 549-50. Thus, the assessment of estate tax was limited to his half of the community property. Similarly, here, income tax was assessed on only half of the community income. Cadwallader does not control on the issue of whether the husband has a property interest in the conjugal property for purposes of section 6321.
 
 
 50
 We faced this issue squarely in Babb v. Schmidt, 496 F.2d 957 (9th Cir.1974). There, California law made the community property liable for the husband's separate debts. The government tried to foreclose pre-marital income tax liens against all of the community property. Relying upon Overman and Ackerman, the wife argued that her husband had no property right in her half of the community property to which a tax lien could attach. We rejected her contention: "If California law makes the wife's share of the community property available to creditors of the husband, California law has by the same rule implicitly given the husband rights in that property sufficient to meet the requirements of 26 U.S.C. Sec. 6321." Id. at 960.
 
 
 51
 The present situation is indistinguishable. Article 161 gives certain of the husband's creditors rights against the conjugal property. Under the holding of Babb v. Schmidt, this is a sufficient property interest to support the tax liens. Accord United States v. Rexach, F.V., 77-1 U.S.T.C. p 9105 (D.P.R.1977); United States v. Benitez Rexach, 411 F.Supp. 1288 (D.P.R.1976) rev'd on other grounds, United States v. Lucienne D'Hotelle, 558 F.2d 37 (1st Cir.1976) (the tax liens imposed on the community property, but tax liability so secured did not exceed half of community assets).
 
 
 52
 The district court was therefore correct in deciding that the tax liens encumbered all of the conjugal property.
 
 III. Liens for Attorney's Fees
 
 53
 TRNL appeals the district court's ruling that any rights TRNL has in these properties are subordinate to the government's tax liens.
 
 
 54
 On January 25, 1965, the United States filed notices of tax liens and notices of pendency of action covering all of the property subject to this suit. Shortly thereafter, the taxpayers employed TRNL to defend them in the ensuing litigation.
 
 
 55
 On April 8, 1965, the taxpayers and the United States executed a stipulation regarding the property subject to the tax liens. Paragraph four of the stipulation provides:
 
 
 56
 (a) Upon the approval hereof by the Court this stipulation shall constitute an order of the Court effective forthwith and restraining defendant Harry S. Stonehill, his agents, employees and attorneys, from in any manner, either directly or indirectly, selling, mortgaging, pledging, encumbering, assigning, or otherwise disposing of, or withdrawing or removing all or part of the properties or assets which he owns in the United States, including, but not limited to those listed in the attached Schedule A, from the jurisdiction of this Court or from the jurisdiction of the United States District Court for the Northern District of California or from the jurisdiction of the United States District Court for the District of Hawaii (as the case may be) or from the territorial confines of the United States.
 
 
 57
 Attorneys from TRNL signed the stipulation on behalf of the taxpayers.[13]
 
 
 58
 By 1977, the taxpayers owed TRNL some $800,000 in legal fees. To satisfy this obligation, the taxpayers executed trust deeds conveying security interests in certain California properties to TRNL. The law firm filed the deeds in the records of Marin County, California. The properties were already the subject of this litigation.
 
 
 59
 TRNL asserts that it has liens on these properties, either because of the trust deeds or because of equitable liens for attorney's fees arising under California law. TRNL also argues that its rights have priority over the government's tax liens.
 
 
 60
 The government's properly filed tax liens normally would take priority over the subsequent rights of TRNL. 26 U.S.C. Sec. 6321. To retain the original priority longer than six years, however, 26 U.S.C. Sec. 6323(g) requires the government to refile its notice of tax lien. Here the government failed to refile within the statutory period. Although the failure to refile does not affect the validity of the liens, it may reduce their priority. S.Rep. No. 1708, 89th Cong., 2d Sess. (Sen.Fin.Comm.) reprinted in 1966 U.S.Code Cong. & Admin.News 3722, 3733. Treasury Regulation 26 C.F.R. 301.6323(g)-1, however, creates an exception to the refiling requirement for property "which is the subject matter of a suit to which the United States is a party, commenced prior to the expiration of the required refiling period." TRNL contends that the regulation is invalid because it is contrary to the legislative intent of the statute it purports to interpret. Because of our resolution of TRNL's claims, we need not reach this issue.[14]
 
 A. The Deeds of Trust
 
 61
 Generally, a client may by agreement grant his attorney a lien to secure legal fees. Isrin v. Superior Court, 63 Cal.2d 153, 403 P.2d 728, 45 Cal.Rptr. 320 (1965); Norman v. Berney, 235 Cal.App.2d 424, 45 Cal.Rptr. 467 (1965); Wagner v. Sariotti, 56 Cal.App.2d 693, 133 P.2d 430 (1943). Here, however, the district judge ruled that the deeds of trust conveyed no valid security interest because they violated the court order. TRNL argues that this ruling was error. By affidavit, TRNL states that the stipulation was not intended to apply to attorney's fees, but was only to prohibit assignment to foreign entities.
 
 
 62
 TRNL's interpretation ignores the plain wording of the order. The order prohibits "in any manner, either directly or indirectly, selling, mortgaging, pledging, encumbering" the property subject to tax liens. This language is unambiguous. TRNL's own 1969 explication of the meaning of the order is in accord. See note 13 supra. The district court did not err in finding that the attempted conveyance violated the order.
 
 
 63
 Nor did the district judge err in holding that the deeds of trust could convey to TRNL no interest superior to the tax liens. TRNL was present at the negotiation and signing of the stipulation. The attempted conveyance treads dangerously close to wilful violation of a court order. A federal court's general equitable and disciplinary powers suffice to invalidate the deeds of trust under these circumstances. See Lamb v. Cramer, 285 U.S. 217, 52 S.Ct. 315, 76 L.Ed. 715 (1932). Any rights of TRNL arising by agreement with the taxpayers are junior to the government's tax liens.
 
 
 64
 TRNL also asserts equitable liens for attorney's fees arising by operation of California law. California law provides an equitable lien for attorneys in only two situations: the creation of a "common fund" or the maintenance of litigation which produces "substantial benefits" for a class. Mandel v. Hodges, 54 Cal.App.3d 596, 620, 127 Cal.Rptr. 244, 260 (1976); Fletcher v. A.J. Industries, Inc., 266 Cal.App.2d 313, 320, 72 Cal.Rptr. 146 (1968). TRNL contends that by substantially reducing the assessment it "protected and preserved" a fund, and thus falls within the "common fund" doctrine under the holding of Winslow v. Harold G. Ferguson Corp., 25 Cal.2d 274, 153 P.2d 714 (1944).
 
 
 65
 In Winslow, a lawyer represented some beneficiaries of a trust. The trust purpose had become impossible to achieve and all the beneficiaries were in danger of losing the value of their interests. The lawyer succeeded in terminating the trust and securing the appointment of a receiver to liquidate the trust assets and distribute them to the beneficiaries and creditors. 153 P.2d at 716. The California Supreme Court stated:
 
 
 66
 It is a well-established doctrine of equity jurisprudence that where a common fund exists to which a number of persons are entitled and in their interest successful litigation is maintained for its preservation and protection, an allowance of counsel fees may properly be made from such fund. By this means all of the beneficiaries of the fund pay their share of the expense necessary to make it available to them.
 
 
 67
 Id. 153 P.2d at 715. In Winslow, the United States was one of the creditors. The court held that an equitable lien arose upon the trust assets for the attorney's fees and took precedence even over pre-existing tax liens. The court commented: "Counsel's right to compensation under such circumstances arises from the benefit conferred upon those who would have suffered loss but for his timely intervention, and not by reason of an agreement to pay his fees." Id. 153 P.2d at 719.
 
 
 68
 The situation at hand is very different from Winslow. In Winslow, the United States was one of a class of creditors who benefited from the lawyers' efforts in protecting the common fund from dissipation. Here, in contrast, no "common fund" existed. TRNL did not "preserve" a fund for the benefit of the United States. Its efforts, in fact, were directed toward defeating the government's claims. TRNL's reliance upon Winslow thus is misplaced. No lien arises in these circumstances. For the same reason the following cases cited by TRNL are inapposite: Kennebec Box v. O.S. Richards Corp., 5 F.2d 951 (2d Cir.1925); In re Holmes Manufacturing Co., 19 F.2d 239 (2d Cir.1927); In re Columbia Ribbon Co., 117 F.2d 999 (3d Cir.1941); Bauer & Son v. Wilkes-Barre Light Co., 274 Pa. 165, 117 A. 920 (1922), and Malm v. Home Riverside Coal Mines Co., 152 Kan. 419, 103 P.2d 798 (1940).
 
 
 69
 Finally, TRNL argues that Mackall v. Willoughby, 167 U.S. 681, 17 S.Ct. 954, 42 L.Ed. 323 (1897), supports its claim to an equitable lien. Mackall, however, is not on point. In Mackall, the attorney and client had a written fee agreement. The dispute involved the proper construction of the word "recovered" as used in the contract. Mackall provides no benefit for a party asserting non-contractual liens.
 
 
 70
 Thus, California law provides no equitable lien in favor of TRNL. Because the trust deeds conveyed no interest, the district court correctly ruled that TRNL has no interest in any of the properties subject to the government's tax liens.
 
 IV. Other Appellants
 
 71
 Appellants Ben Gromet, William W. Saunders, Tower Development Corporation, and Meriwether Development Corporation claim interests in certain properties involved in this suit. These appellants stipulated that the validity of the tax liens should be tried before determination of their respective rights in the property. The district court's order purported to dispose of the interests of all parties, although it did not expressly consider the claims of these appellants.
 
 
 72
 These appellants have not yet had their day in court. The judgment, insofar as it pertains to them, is reversed and remanded to the district court for determination of their claims.
 
 CONCLUSION
 
 73
 The judgment insofar as it relates to Ben Gromet, William W. Saunders, Tower Development Corporation, and Meriwether Development Corporation is reversed and remanded for resolution of their claims. The judgment as it relates to all other appellants is affirmed.
 
 
 74
 AFFIRMED in part; REVERSED in part and REMANDED.
 
 
 
 [1]
 The imported tobacco was used in cigarettes sold under the brand names Kent and Old Gold
 
 
 [2]
 These illegal dealings were documented by evidence introduced on the issue of fraud. The district court held that the government had proved fraud by clear and convincing evidence. The taxpayers do not contest this portion of the decision
 
 
 [3]
 The tobacco barter permit allowed the taxpayers to import ten million pounds of American tobacco on condition that they export fourteen million pounds of Philippine tobacco. Supposedly, the value of the exported tobacco would equal the value imported, and thus prevent any flow of currency out of the Philippines. In fact, American tobacco cost about four times as much as Philippine. The taxpayers therefore needed large sums of money in the U.S. to purchase the American tobacco. Philippine law, however, severely restricted the outflow of currency from the country. Part of the diversion of funds to Switzerland was to evade these Philippine currency restrictions
 
 
 [4]
 A State Department interoffice memorandum dated January 10, 1962 stated:
 Parsons stated in the opinion of the Embassy it is imperative for American interests in the Philippines that some way be found to get Stonehill out of the Philippines and break his stranglehold here. The reasons for their concern were known to me, although I did not concern my December memorandum with details on the areas not of direct interest to Internal Revenue; nor will I burden the memo with these details. In general, however, Stonehill has had an evil and corrupt influence on the Philippine government in the past and has now indicated that he will manipulate the new administration in the Philippines even more visciously (sic). Whereas the American government is vitally interested in developing and improving the democracy and economy of the Philippines, it appears that Stonehill's individual influence may be sufficient to undermine the entire American effort and perhaps destroy democracy here and the cost to the United States will be immeasurable and much beyond the hundreds of millions involved in the aid programs and loans.
 The memorandum concluded that the "only attack that can be made on Stonehill is through IRS."
 
 
 [5]
 The taxpayers' records were never returned to them by the Philippine government. Many of the records were apparently destroyed by a typhoon in 1970
 
 
 [6]
 26 U.S.C. Sec. 6861(a) provides:
 (a) Authority for making.--If the Secretary or his delegate believes that the assessment or collection of a deficiency, as defined in section 6211, will be jeopardized by delay, he shall, notwithstanding the provisions of section 6213(a), immediately assess such deficiency (together with all interest, additional amounts, and additions to the tax provided for by law), and notice and demand shall be made by the Secretary or his delegate for the payment thereof.
 
 
 [7]
 26 U.S.C. Sec. 6321 is quoted at note 12, infra
 
 
 [8]
 The government filed suits to foreclose tax liens in the district courts for the Northern District of California, the Central District of California, and the District of Hawaii. The parties have agreed that the judgment of the District Court for the Central District of California shall be entered as the judgments in the other actions
 
 
 [9]
 One other adjustment was made to the assessments. About $700,000 in bribes to various officials were documented in a secret "Blue Book." The State Department feared that publication of the Blue Book would damage United States foreign policy interests. The government therefore agreed to treat the $700,000 as deductible business expenses and the taxpayers agreed not to claim that this change in the assessments made them arbitrary. The district court then sealed the book
 
 
 [10]
 The status of the net worth calculations was somewhat unclear. The district judge based portions of his opinion upon them. 420 F.Supp. at 59-61
 
 
 [11]
 Philippine law uses the term "conjugal property" instead of community property. For our purposes, they have the same meaning
 
 
 [12]
 26 U.S.C. Sec. 6321 provides:
 If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.
 
 
 [13]
 Hans Nathan, a partner in TRNL, later explained the stipulation:
 I personally negotiated and reached an understanding with opposing counsel to the effect that, to effect an orderly disposition of this case without causing any prejudice to the United States, the Defendant would be permitted to obtain funds from sources abroad; to expend these funds freely to defray his living expenses and for the expenses of this suit during the pendency thereof. Defendant in turn would not attempt to dispose of any assets located in the United States at the time of the entering into of said agreement. The agreement was implemented by a stipulation and order dated April 9, 1965 and filed herein.
 
 
 [14]
 The government argues that regardless of the validity of the treasury regulation the tax liens take priority under the California law of lis pendens. We note that the special filing procedures for tax liens may preclude reliance upon state lis pendens rules to protect tax liens. Again, however, in view of our disposition of TRNL's claims, we need not decide this issue