DOROTHY BARBOA FLEMING, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fleming v. Commissioner
Docket No. 5189-82.
United States Tax Court
T.C. Memo 1984-130; 1984 Tax Ct. Memo LEXIS 543; 47 T.C.M. (CCH) 1281; T.C.M. (RIA) 84130; March 15, 1984. Lee E. Karavitis, for the petitioner. James Gehres, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies and additions to tax in petitioner's 1974 and 1976 *544 Federal income taxes as follows: Additions to Tax
Year
Deficiency
sec. 6651(a) [1]
sec. 6653(a)
sec. 6654
1974
$7,921.31
$1,980.33
$396.07
$253.48
1976
99,224.14
24.806.04
4,961.21
3,703.03
The issues for decision are: (1) whether petitioner is liable for income taxes on one-half of the amount of income determined by respondent to have been received by petitioner and her husband during the years in issue; (2) whether petitioner is liable for additions to tax under section 6651(a) for failure to file a return; (3) whether petitioner is liable for additions to tax under section 6653 for negligence or intentional disregard of rules and regulations; and (4) whether petitioner is liable for additions to tax under section 6654 for failure to pay estimated income tax. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner resided in Fort Worth, Texas, at the time the petition was filed in this case. Neither petitioner nor her former husband filed income tax returns *545 for 1974 or 1976. In March 1970, petitioner married Eddie R. Barboa (Barboa) and they lived together in Albuquerque, New Mexico. Petitioner and Barboa separated in 1980, and were divorced on May 23, 1980. Petitioner and Barboa first met in 1969 when she was hired to work for his company, Barboa Construction Company (Company). Barboa was a general contractor, and his company's business was building residential houses. During the years in issue Barboa was also a New Mexico state senator. Barboa is currently incarcerated in a Federal Penitentiary in Texas. [2]
Initially, petitioner worked for the company as a part-time bookkeeper and as a salesperson. Petitioner had no formal training as a bookkeeper or in accounting; her professional experience was as a salesperson for home improvement companies (e.g., roofing and siding). After her marriage to Barboa, petitioner's activities with the company increased. During the years *546 in issue, petitioner performed a variety of tasks, including signing most of the company checks. Petitioner also had access to the company's books and records. She also supervised a staff of approximately four people. Petitioner occasionally hired personnel, and on one occasion, fired an employee who Barboa immediately rehired. Notwithstanding petitioner's position, Barboa made all significant business decisions. Sometimes Barboa's schedule required him to be away from home for several weeks at a time. However, even while he was away from the office, Barboa continued to make the important management decisions for the company. During the years in issue, petitioner received a salary of $250 per week as an employee of the company. At the time of petitioner's and Barboa's marriage in 1970, in addition to his construction company, Barboa owned several properties including an apartment building, two commercial properties which were rented, and two personal residences, one of which he owned jointly with his former wife. Some of these properties were encumbered; however, the amounts of the mortgages are not clear from the record. Also, the evidence does not indicate either the *547 value of the properties or the amount of any income (gross or net) -- if any -- derived from the properties. Petitioner brought to the marriage personal property worth approximately $3,000. Sometime shortly prior to or sometime after their marriage petitioner and Barboa both signed an agreement concerning the ownership of each others property. The gist of the agreement was that in the event of a divorce, petitioner would receive only the property she owned prior to the marriage, plus $1,000.The agreement was drafted by Barboa's attorney, Jerry Rhoades (Rhoades), executed in Rhoades' office, and notarized by Rhoades' receptionist. [3]
Petitioner has not seen the agreement since the day it was executed. During her marriage, when a heated argument would occur between petitioner and Barboa, he would often refer to the agreement, telling petitioner she could take the $1,000 and "go [her] own way." When petitioner and Barboa were divorced in 1980, petitioner received $2,000 plus a car and her clothing. The total value of these assets was approximately $4,000. During her marriage, petitioner relied on her own salary for most *548 of her personal needs. Petitioner and Barboa also maintained several joint checking accounts. Although she utilized these accounts, it was usually pursuant to her husband's direction. For example, Barboa would instruct petitioner to write a check to pay a building supplier or to obtain liquor for a political gathering. Petitioner was not aware of the amount of money in these accounts, or of Barboa's annual income during their marriage. During their marriage, petitioner and Barboa owned some property jointly. Sometime shortly before their divorce, after a violent argument, Barboa forced petitioner to deed all jointly held property over to him. Throughout their marriage, petitioner did whatever Barboa instructed because "he was the boss." For most of the years that they were married, petitioner was afraid of Barboa. [4]
*549 Barboa relied on Rhoades and other counsel for tax planning and compliance. Petitioner recognized the need to file tax returns, and occasionally asked her husband and his counsel about filing returns. In response to her inquiries, she was told that filing returns was not her concern. On at least one occasion, petitioner was aware that Rhoades was cooperating with the Internal Revenue Service in attempting to file petitioner's and Barboa's tax return. Petitioner was not aware whether she or her husband ever filed 1974 or 1976 tax returns. Petitioner and Barboa did not file returns for 1974 or 1976. Respondent employed a bank deposits method of computation to construct petitioner's and Barboa's taxable income for those years. Respondent determined that petitioner and Barboa received adjusted gross income of $77,168.51 and $400,879.70 in 1974 and 1976, respectively. Furthermore, respondent determined that the income was community income, and attributed one-half of each of these amounts to petitioner for each of the years in issue. After deducting amounts for itemized deductions and for three exemptions, respondent determined that petitioner received taxable income of $33,882.22 *550 and $195,724.28 in 1974 and 1976, respectively. Petitioner does not dispute respondent's method of constructing income, or the total amount of adjusted gross income determined by respondent. Rather, she argues that it is not community income, and that therefore she is not liable for income tax on these amounts. OPINION 1. Community Income. -- It is well established that a wife's ownership rights in community income render her taxable on one-half of such income. Poe v. Seaborn282 U.S. 101, 109 (1930); United States v. Malcolm,282 U.S. 792, 794 (1931). Whether income is community income depends on the law of the particular State wherein the taxpayer's reside. United States v. Mitchell,403 U.S. 190, 197 (1971). Petitioner and her husband lived in New Mexico during the years herein involved. Petitioner makes three arguments in support of her position that she is not liable for tax on one-half of the amount of money received by her husband during 1974 and 1976. Petitioner argues that the money received by Barboa was derived from his separate property; that by virtue of the agreement between petitioner ane Barboa any *551 money received during their marriage was deemed Barboa's separate income; and, if we find that the money received was community income, that she should be entitled to a theft loss deduction. Petitioner's first argument is that the money received during the years in issue was derived from her husband's separate property and therefore is not community income. New Mexico is a community property state. Under New Mexico state law, separate property includes property acquired by either spouse before the marriage, and the rents, issues and profits thereof. N.M. Stat. Ann. sec. 40-3-8 (1978). Prior to their marriage, petitioner owned property worth approximately $3,000. Clearly this property and petitioner's salary did not generate adjusted gross income of $77,168.51 and $400,879.70 in 1974 and 1976, respectively. Prior to their marriage, Barboa owned substantial assets, including a profitable construction company and other passive investments.This property represents separate property under New Mexico law. Certainly, the majority of money received by petitioner and Barboa during the years in issue was derived from this separate property. However, this *552 fact alone does not sustain petitioner's position. Granted, separate property includes the rents, issues and profits derived therefrom. However, separate property does not include income earned by a spouse in conducting his or her separate business. The community owns this earning power. Moore v. Moore,71 N.M. 495, 379 P.2d 784 (1963) (separate property does not necessarily mean that the income therefrom is separate property); Katson v. Katson,43 N.M. 214, 89 P.2d 524 (1939). Applying these concepts to the instant case, Barboa was the owner, as his separate property, of a profitable construction company. He also owned as his separate property, certain passive investments. It is safe to assume that most of the bank deposits upon which respondent based his deficiency determination emanated from these two sources. There is nothing in the record to indicate how the construction business was managed or that Barboa received a salary for managing it. Nor is there any indication that Barboa received commissions from managing the real estate investments. The bank deposits, business expenses paid therefrom, loans deposited therein and paid therefrom *553 indicate that the deposits and withdrawals represented for the most part gross income and expenses of the construction business and that the excess of deposits over withdrawals represented income of the construction business itself rather than personal income of Barboa. However, it seems clear from the evidence that the construction company net income was attributable in part to Barboa's capital invested therein and in part to Barboa's personal services.Under such circumstances there should normally be an allocation of the net income of the business between that attributable to the capital in the business, which belonged to Barboa, and was his separate income, and that attributable to Barboa's personal services which would normally be community income. Estate of Eaton v. Commissioner,10 T.C. 869 (1948); Estate of Parker v. Commissioner,31 B.T.A. 644 (1934); Bass v. Commissioner,T.C. Memo. 1983-228. [5] However, New Mexico law allows spouses to enter into agreements to convert property from community property to separate property and visa versa. N.M. Stat. Ann. section 40-2-2 (1978); Allen v. Allen,98 N.M. 652, 651 P.2d 1296 (1982). *554 Petitioner argues that she is not liable for income tax on any of the income received during the marriage because of the marriage settlement agreement which transmuted Barboa's earnings from his personal services into his separate income. *555 According to petitioner the agreement provided that all property and money received during the marriage -- except her salary -- belonged to Barboa. Furthermore, in the event of a divorce, petitioner was entitled to only the property she owned prior to the marriage, plus $1,000. Respondent does not dispute petitioner's interpretation of this agreement. Rather, respondent's position is that New Mexico law requires that marriage settlement agreements be in writing. According to respondent, because the agreement is not in evidence, and because petitioner's testimony was "vague," there is no evidence to support petitioner's contention that community property was converted to Barboa's separate property. Under New Mexico law, all marriage settlement agreements must be in writing, and executed in a like manner as a grant of land is required to be executed. N.M. Stat. Ann. section 40-2-4 (1978); Tellez v. Tellez,51 N.M. 416, 186 P.2d 390 (1947). Petitioner testified that the agreement was in writing, signed by both parties, and notarized. Thus, according to the only evidence we have, it does appear to conform to section 40-2-4. See N.M. Stat. Ann. section 14-13-9 *556 (1979), "Forms; instructions affecting real estate." As respondent points out, however, the agreement itself was not introduced in evidence. This is not necessarily a fatal infirmity. When a document is lost or destroyed, several jurisdictions, including New Mexico, allow secondary evidence, including oral testimony, to prove its contents. See Williams v. Miller,61 N.M. 326, 300 P.2d 480 (1956) (proof of a lost document's contents may be proved by any witness who has seen the document and has personal knowledge of what it contains). See also Johnson v. Johnson,74 N.M. 567, 396 P.2d 181 (1964); McCormick on Evidence, section 237 (E. Cleary ed. 1972); 3 2A C. J.S., Evidence, sections 823, 824. In the instant case, the agreement was executed over ten years ago. The attorney who drafted it is dead, and petitioner's former husband is in prison. Petitioner never had the agreement in her possession. We can safely assume that the agreement has been lost or destroyed, at least so far as its availability to petitioner is concerned, and we believe that this is an appropriate case in which to accept petitioner's testimony as to the contents of the *557 agreement. Respondent also argues that petitioner's testimony concerning the contents of the agreement was vague, and that therefore we should not rely on it. Although petitioner could not remember precisely when the agreement was executed, she could remember its pertinent provisions: it was signed by the parties, notarized, and provided that Barboa's separate property should remain his and that any property acquired during the marriage through his efforts should be his separate property. Petitioner was a credible witness, and we believe her testimony. In addition, petitioner's testimony is consistent with Barboa's behavior during the marriage. For instance, prior to their divorce, Barboa forced petitioner to deed to him all property which they held jointly. Also, although petitioner and Barboa had joint checking accounts, petitioner ordinarily wrote checks on those accounts only pursuant to Barboa's instructions. She relied on her salary for her personal needs. Finally, both petitioner and Barboa relied on the agreement and carried out its terms. When they divorced, petitioner received propety valued at $4,000. Although she received $1,000 more in cash than the agreement *558 called for, the total value of the property she received ($4,000) is the same value provided in the agreement. In sum, the evidence establishes that most of the income determined by respondent was either derived from barboa's separate property and was his separate income, or was transmuted into Barboa's separate income by the marriage settlement agreement. The actions of the parties with respect to the moneys received during the marriage support this conclusion. Two sources of income that were not specifically alluded to in petitioner's description of the marriage settlement agreement are petitioner's salary and Barboa's compensation as state senator.These earnings during the marriage would be community income unless transmuted into separate income. It appears from the evidence that petitioner paid her expenses out of her own salary and considered it to be her separate income. There is no evidence that Barboa shared any of his income with her. Furthermore, when petitioner and Barboa were divorced, petitioner received none of the fruits of Barboa's income, except possibly $1,000. In light of these facts and the record as a whole we construe the marriage settlement agreement *559 to have transmuted each spouse's income to be separate property. Petitioner's salary was roughly $13,000 a year.In computing petitioner's income, respondent allowed her a deduction of $2,250 for three execptions for both 1974 and 1976. Therefore, we conclude that her taxable income was $10,750 for both 1974 and 1976. Our conclusion above makes it unnecessary to address petitioner's third attack on respondent's determination, i.e., that if the money received was community income, she would be entitled to a theft loss deduction.
2.Additions to tax. -- Respondent also determined that petitioner is liable for additions to tax under sections 6651(a), 6653, and 6654 for the years in issue. Petitioner bears the burden of proof on these issues. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
With respect to the additions to tax for failure to file a return and for negligence, we believe petitioner has satisfied her burden. Several times petitioner attempted to obtain information from either her husband or his counsel concerning their tax liability and compliance with the tax laws but all of her attempts were rebuffed. *560 The personal and company finances were controlled by Barboa, and petitioner had no choice but to trust him in tax matters. In view of petitioner's inquiries to ascertain information, and her belief that Barboa, Rhoades and others were acting on her behalf to comply with the tax laws, we believe petitioner did not willfully neglect to file or pay tax, but had reasonable cause. [6]
Turning to section 6654, petitioner did not address this issue at trial or on brief. There are no facts in the record which would exempt petitioner from complying with this section. Accordingly, petitioner is liable for this addition to tax based on her taxable income of $10,750. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, and in effect during the years in issue.↩
2. At trial, petitioner testified that Barboa was "charged" with several illegal activities during the time they were married. However, it is not entirely clear for what crime Barboa was sentenced. Barboa has been incarcerated since 1980 or 1981.↩
3. Rhoades died sometime during the mid-1970's.↩
4. Petitioner testified that her husband had a violent temper, and since approximately 1971, drank heavily. After petitioner and Barboa were divorced, petitioner continued to work for the company. One day in 1980 or 1981, Barboa went to petitioner's office, and an argument ensued. Barboa fractured one of petitioner's ribs, and gave her a concussion. Petitioner left Alburquerque soon thereafter.↩
5. Respondent determined that the entire amount of unreported income, i.e., the entire amount of the net bank deposits, was community income, thus allocating no part of the income to Barboa's capital investment in the construction business, nor to Barboa's investments in his real estate holdings.Petitioner has the burden of proving error in respondent's determination, but under the circumstances here present, she had no means of proving a proper allocation. Respondent offered no evidence as to the sources of the income it determined to be community income. Thus we would have little basis on which to make an allocation of the income between income attributable to Barboa's separate capital investments and that attributable to his personal services. We think it is apparent, however, as respondent argued in Estate of Eaton v. Commissioner,supra,↩ that in the construction business and the real estate investment business, a considerable part of the income of those businesses is generated by the capital invested therein. So we find that respondent's determination was erroneous. This would leave the ball in our court to determine the proper allocation of the income, if necessary, which it is not.
6. See Connor v. Commissioner,T.C. Memo, 1982-302↩.