PATRICIA A. CALHOUN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Calhoun v. Commissioner
Docket No. 13361-90
United States Tax Court
T.C. Memo 1992-408; 1992 Tax Ct. Memo LEXIS 434; 64 T.C.M. (CCH) 222; July 20, 1992, Filed *434 Decision will be entered for the respondent in accordance with the notice of deficiency. For Petitioner: Tim Reidinger. For Respondent: Timothy A. Lohrstorfer. RAUM
RAUM
MEMORANDUM OPINION RAUM, Judge: The Commissioner determined deficiencies and additions to tax against petitioner as follows: Additions to Tax
Taxable Year Ended
Deficiency
6651(a)(1)
6653(a)(1)
6653(a)(2)
December 31, 1981
$ 2,548.00
$     0.00
$   0.00
$      0.00   December 31, 1982
2,751.00
653.75
137.55
50% of the  interest due
on $ 2,615   December 31, 1983
2,329.00
582.25
116.45
50% of the  interest due
on $ 2,329   Totals
$ 7,628.00
$ 1,236.00
$ 254.00
In the Answer the Commissioner claimed that petitioner was also liable for "a 25% addition to the income tax under the provisions of I.R.C. section 6651(a); [1] a 5% addition to the tax under the provision of I.R.C. section 6653(a)(1) and an addition to the tax equal to 50% of the interest due on the tax deficiency of $ 2,548.00 for the taxable year 1981 under the provisions of I.R.C. section 6653(a)(2)". The case was submitted on the basis of a stipulation of facts and exhibits. *435 The issues for decision are (1) whether petitioner is subject to income tax on one-half of her husband's wages and unemployment compensation income received by him while the couple resided in California, (2) whether petitioner is subject to tax on one-half of the long-term capital gain she and her husband realized on the sale of the house they owned in California, and (3) whether petitioner is liable for additions to tax under sections 6651(a)(1), 6653(a)(1), and 6653(a)(2), for each of the taxable years at issue. Petitioner was married to Robert L. Calhoun ("Robert") about 1963, and they remained married during all relevant times. They will sometimes hereinafter be referred to as the Calhouns. They have two daughters, Robin and Kathleen, both of whom resided with them at all times relevant to the years in *436 issue. In 1983, Robin was about 18 or 19 years old and Kathleen was about 12 years old. Robert was an ironworker. He worked for various California employers during the taxable years, and received wages from them. He became disabled in 1983 and began to receive unemployment compensation. Petitioner and Robert were residents of California until August 15, 1983. They had purchased their home in Simi Valley, California, for $ 45,000 on or about December 3, 1973. The Calhouns sold their California home in 1983 for $ 97,500. Although the sale was initiated with a "joint tenancy grant deed" which petitioner and Robert executed conveying the property to the purchasers on March 11, 1983, that deed was apparently kept in escrow until final consummation of the sale on August 8 or 9, 1983, as shown by the closing statement. It was at that time that payment in full was finally made by or on behalf of the purchasers, and disbursements were made by the escrow company handling the transaction. The March 11, 1983 deed was recorded on August 9, 1983. After allocation of the $ 97,500 purchase price to discharge liabilities to mortgagees and after taking into account various other pertinent *437 items, the Calhouns received a net amount of $ 45,922.80 by check dated August 9, 1983. As will appear more fully hereinafter, another home was purchased at about the same time in English, Indiana, and after leaving California on August 15, 1983, they resided in the newly-acquired Indiana home with their daughters. Petitioner and her husband filed joint personal income tax returns for all tax years prior to the 1981 tax year, but none thereafter. In 1981, Robert became a tax protester and joined an organization known as the "Patriots", which was also known as "Your Heritage Protection Association" or "Y.H.P.A." The Patriots were Robert's exclusive source of tax advice with respect to Federal income taxes that were due for 1981 and 1982. He decided not to file an income tax return for 1981. The Commissioner wrote to Robert and petitioner by letter dated "3-25-83", inquiring why they had not filed an income tax return for 1981. Robert responded by letter dated April 14, 1983, which the Patriots had assisted him in writing. The letter stated that it was "a 'Special Appearance' to disclaim all I.R.S. jurisdiction with respect to the request or demands you have made on me". The *438 letter also stated in part: I am not required to file, since I, as a free American citizen, do not come under the jurisdiction of the following: 5 U.S.C. S101, 554, 556 and 701-702. I am not an employee, employer or an officer of a corporation, etc., as defined by the Internal Revenue Code Title 26 S3401(c). I am not elected, appointed nor am I an employee of the United States Government, state government, nor a division of any government, nor am I under civil service. Robert filed for bankruptcy protection under Chapter 13 on April 19, 1989. Prior thereto, in 1987 and 1988, the IRS had made assessments against him for income taxes, additions, and interest with respect to the tax years 1981 and 1982, and had issued levies for collection to the "California Ironworkers Pension." On or about December 2, 1988, possibly in anticipation of his bankruptcy petition, Robert filed income tax returns for 1981, 1982, 1983, 1984, 1985, 1986, and 1987. He had not previously filed any income tax returns for any of those years. On the returns, he stated his filing status as "Married filing separate return." The 1981 and 1982 returns stated that his occupation was "Iron Worker", while the *439 1983 return stated that his occupation was "Disabled". The following table summarizes the information contained in Robert's income tax returns for the three taxable years 1981 through 1983: 1981
1982
1983
Adjusted gross income
$ 34,332.63
$ 37,473.32
$ 13,465.60
Itemized deductions
5,407.60
5,475.00
5,193.00
Exemptions [1]
4,000.00
4,000.00
4,000.00
Taxable Income
24,925.03
27,998.32
n2 4,322.60
Tax
7,352.26
5,963.76
586.84
Amount of Tax withheld
656.00
272.00
-0- Tax due with return
$  6,696.26
$  5,691.76
$    586.84
All of the income reported on the returns for these three taxable years was earned by Robert Calhoun while he was a resident of California. These returns did not contain any information or report any income pertaining to the *440 sale of the California residence. Petitioner did not file income tax returns for the taxable years in issue, 1981, 1982, and 1983, or, as far as appears from the record, for any year thereafter. In the notice of deficiency, the Commissioner determined that petitioner was liable for tax on one-half of Robert's wages and unemployment compensation during the years 1981-83, [2] as well as on one-half of the gain realized on the sale of the California house in 1983. The Commissioner also determined that petitioner was liable for additions to tax under sections 6651(a)(1), section 6653(a)(1), and section 6653(a)(2), for her 1982 and 1983 taxable years, and claimed in the Answer that petitioner was liable for additions to tax pursuant to such sections with respect to her 1981 taxable year as well. We sustain the Commissioner as to the determined deficiencies, but not as to the amounts claimed in the Answer. *441 1. Robert's wages and unemployment compensation related to his work in California. Petitioner and Robert were residents of California during the years in issue. California is a community property State, and, under California law, a wife generally has a present interest in one-half of any personal property that is acquired by her husband during the marriage. Cal. Civ. Code secs. 5105, 5110 (West 1983). Her one-half community property interest plainly extends at least to her husband's earnings. United States v. Malcolm, 282 U.S. 792 (1931); MacMurray v. Commissioner, 21 T.C. 15, 17-19 (1953); Simmons v. Cullen, 197 F.Supp. 179, 181 (N.D. Cal. 1961). See United States v. Mitchell, 403 U.S. 190, 194-197 (1971), revg. 430 F.2d 1 (5th Cir. 1970), which in turn had reversed Mitchell v. Commissioner, 51 T.C. 641 (1969). Unless an exception to this rule applies, then, petitioner is liable for income tax on one-half of the wages and unemployment compensation received by Robert during 1981, 1982, and 1983. Petitioner contends on brief that "Robert Calhoun has asserted *442 his separate ownership of all the income for 1981, 1982 and 1983." She requests us to conclude that she and her husband agreed to treat the wages and unemployment compensation he received as his separate property rather than as community property, and that she is accordingly not liable for tax on such income. To be sure, California law allows a husband and wife to agree to treat property that would otherwise belong to the community as the separate property of one spouse. Wikes v. Smith, 465 F.2d 1142 (9th Cir. 1972). However, petitioner has not shown that she and Robert entered into any agreement, express or implied, that transmuted Robert's wages and unemployment compensation from community property to his separate property. There is no evidence whatever that the spouses entered into any such agreement in writing, nor is there any evidence of even an oral agreement to that effect. Certainly, no such agreement can be inferred from the fact that Robert filed his untimely individual tax returns in December 1988 for the years in issue as "married filing separately", shortly before filing for bankruptcy. This fact might indicate that Robert did not want his wife *443 to be liable for payment of the tax for the prior years, but it hardly constitutes persuasive evidence that petitioner had in fact effectively agreed with her husband that his 1981-83 earnings were to be treated as his separate property. Moreover, the spouses plainly could not, subsequent to 1983, retroactively change the taxable character of earnings attributable to the earlier years of 1981-83. Petitioner has stressed the fact that the Commissioner has already assessed Robert for the full amount of tax, additions, and interest, in respect of his 1981-83 wages and unemployment compensation. However, as argued by respondent, neither the Government nor the taxpayer is bound by the manner in which either treats such income where only one-half of the community income is properly allocable to the spouse who earned it. Stanton v. Commissioner, 21 B.T.A. 1380 (1931) (husband's attempt to report all his community earnings in order to take advantage of a carryover loss held ineffective). We hold that petitioner is liable for tax on one-half of the wages and unemployment compensation received by Robert during the years at issue, 1981-83. 2. Gain on Sale of California *444 residence.
As indicated above, petitioner and Robert sold their California home for $ 97,500 shortly before leaving California for Indiana in August 1983. Since they had purchased it in 1973 for $ 45,000, the gross amount of gain on sale was $ 52,500 ($ 97,500 minus $ 45,000). To arrive at the net gain, the Commissioner reduced that $ 52,500 by $ 2,000, the buyers' closing costs shown to have been paid by the sellers. The Commissioner then allocated one-half of the $ 50,500 net gain, or $ 25,250, to petitioner to reflect her half interest in the net gain. After reducing that $ 25,250 by the 60 percent capital gain deduction allowed by section 1202(a), the Commissioner finally determined that the resulting $ 10,100 was includable in petitioner's gross income as her net taxable one-half share of the gain. Petitioner's only objection to the inclusion of this $ 10,100 in her gross income is her contention that the gain on sale was nonrecognizable pursuant to section 1034(a) by reason of the Calhouns' purchase of a new principal residence in Indiana. Before discussing the applicability of section 1034(a), additional facts surrounding the purchase of the Indiana property need to *445 be set forth. Unfortunately, the record is far from satisfactory in respect of the acquisition of the new residence. On or about April 21, 1983, petitioner and her husband as purchasers executed an agreement to purchase 24.63 acres of land and a personal residence located in English, Crawford County, Indiana. The purchase agreement stated the price of this property to be $ 55,000. Petitioner and her husband made a downpayment of $ 2,000 at that time plus an additional downpayment of $ 10,000 on May 23, 1983. [3] The purchase agreement contained two blank spaces in which the names of the buyers were to be printed as such names were to appear on the deed. The names of Robert and petitioner were printed by hand in these blank spaces immediately above their signatures. There was nothing in the purchase agreement stating or even suggesting that the designated purchasers were acting on behalf of any other person in executing the agreement. *446 The parties herein have stipulated that "Petitioner and her husband used the proceeds from the sale of the California residence to payoff [sic] the balance owed on the purchase price" of the Indiana property. They have stipulated further that "The balance due was paid off with cash." The closing occurred on August 15 or 16, 1983, but title to the property was taken in the names of the Calhouns' daughters, Robin and Kathleen. Petitioner and Robert resided in the Indiana property from at least August 16, 1983, the date the deed was recorded, to the date Robert filed for bankruptcy on April 19, 1989. However, at the time petitioner filed the petition herein, she resided in Uniontown, Pennsylvania. In the deposition taken by the United States in connection with his bankruptcy, Robert testified that the Indiana residence is "owned by my daughters", and that when he signed the purchase agreement he was "acting on their behalf". He testified further that "It was a situation where the family had agreed that since this was our last move in my lifetime, that anything was for the future of my daughters." Also, "The property is theirs; if they choose to sell it, the money is theirs to do *447 with as they wish." Robert indicated that he lived in the property pursuant to an agreement with his daughters "that we would pay the utilities and I would do the maintenance and upkeep of the property and pay the taxes on it." After a painstaking review of the evidence, we conclude that the requirements of section 1034(a) are not satisfied here. Section 1034(a), which is set forth in the margin, [4] provides that if a taxpayer's principal residence is sold, and a new principal residence purchased within a certain time period, the gain on the sale of the old principal residence shall be recognized only to the extent that the sales price of the old residence exceeds the cost to the taxpayer of the new residence. We note preliminarily that, even if section 1034(a) were applicable here, only a minor portion of the gain on sale would escape recognition, and the deficiency determined against petitioner would consequently be reduced only by a comparatively small amount, as explained more fully in the margin. [5]
*448 However, section 1034(a) is inapplicable here because the taxpayer, Patricia A. Calhoun, has not satisfied the burden of proving that she "purchased" a new residence, as literally required by section 1034(a). The deed to the Indiana property does not bear the names of either petitioner or Robert, and it has been held that where title to the purported new residence is taken in the name of someone else, a taxpayer has not "purchased" a new residence within the meaning of section 1034(a) notwithstanding the fact that the taxpayer paid for the property. Marcello v. Commissioner, 380 F.2d 499, 502 (5th Cir. 1967), affg. 43 T.C. 168 (1964) and T.C. Memo. 1964-299; May v. Commissioner, T.C. Memo. 1974-54; Rev. Rul. 55-37, 1955-1 C.B. 347. Petitioner argues that the purchase agreement itself executed by the Calhouns was sufficient under Indiana law to transfer "equitable title and ownership" of the Indiana property to them. She argues further that nothing in section 1034(a) precludes the application of that section in the event of such a transfer. Passing the question whether section *449 1034(a) might apply if the purchase agreement had the effect contended for by petitioner, we reject this argument as faulty. The Indiana law relied upon by petitioner is Bill Becom Service T.V., Inc. v. Jones, 503 N.E.2d 1246 (Ind. App. 1987). She cites that case to support her contention that the purchase agreement alone sufficed to give the Calhouns equitable title to the Indiana property at the time of its execution on or about April 21, 1983, prior to the conveyance of the property to their daughters on August 15 or 16, 1983. However, that case involved a "land sale contract", which differs substantially from the purchase agreement in this case. The court in Bill Becom stated that upon entry by the parties into a land sale contract, all incidents of ownership, including the right to collect rent, accrue to the purchaser. By contrast, for example, the purchase agreement here reserved to the sellers the right to keep all rents prorated to the date of closing, and the sellers continued to bear all the burdens of ownership prior to closing, such as the risk of loss by fire or otherwise and the payment of mortgage interest. We find the present case sharply *450 distinguishable from Bill Becom. 3. Additions to tax. Section 6651(a)(1) imposes an addition to tax of 5 percent of the amount of tax required to be shown on the return for each month or portion thereof for which the return remains unfiled, up to a maximum of 25 percent of the amount of tax required to be shown on the return. [6] However, there is no addition to tax under section 6651(a)(1) if the failure to file is due to reasonable cause and not to willful neglect. Section 6653(a)(1) imposes an addition to the tax equal to 5 percent of any part of an underpayment of tax that is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) provides a further addition to the tax of 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment due to negligence or intentional disregard of rules or regulations. [7] "Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. 43 T.C. 168 (1964) and T.C. Memo. 1964-299; Neely v. Commissioner, 85 T.C. 934, 947 (1985). *451 In substance, the standards in section 6651(a)(1) and section 6653(a) are similar. Petitioner *452 has the burden of proof for all these additions in respect of 1982 and 1983, but not 1981. The 1982 and 1983 additions were determined against her in the notice of deficiency, and it is well established that the burden is upon her as to those years. Service Bolt & Nut Co. v. Commissioner, 724 F.2d 519, 524 (6th Cir. 1983) (section 6651), affg. 78 T.C. 812 (1982); Marcello v. Commissioner, supra (section 6653); Neely v. Commissioner, supra (same); Baldwin v. Commissioner, 84 T.C. 859, 870 (1985) (section 6651). On the other hand, the Commissioner claimed the additions for 1981 for the first time in the Answer, and the burden of proof as to 1981 is upon the Government. Rule 142(a). In our judgment neither side has carried its respective burden of proof. There is a dearth of proof in respect of negligence, reasonable cause, willful neglect, and intentional disregard of rules or regulations. Petitioner and her husband had filed joint income tax returns for all relevant years prior to 1981. There is no evidence that she made any effort to ascertain why none were due thereafter *453 or to learn why she was not required to file a separate return. Nor is there any evidence that she had any other reason to think that no return was due. To be sure, in a letter relating to 1981 dated "3-25-83", which was mailed to the Calhouns by the IRS, it was stated in boldface type that "YOUR TAX FORM IS OVERDUE -- LET US HEAR FROM YOU NOW". Yet, there is no evidence relating to what, if anything, was done about this communication. The record is utterly devoid of any evidence as to what part, if any, petitioner played in determining not to file any joint returns for any of the 3 years, or as to the reason why she did not file any separate returns. On the basis of what we have before us we can conclude only that petitioner has failed to carry her burden of proof as to 1982 and 1983. At the same time, the Government has not presented any satisfying evidence to carry its burden with respect to 1981. The parties have made various other contentions, which we have not found it necessary to discuss. In order to reflect the foregoing, Decision will be entered for the respondent in accordance with the notice of deficiency. Footnotes
1. Except as otherwise indicated, all section references are to the Internal Revenue Code as in effect for the taxable years at issue. All Rule references are to the Tax Court rules of Practice and Procedure.↩
1. Four exemptions were claimed on each return, one for Robert, one for petitioner, and one each for their two daughters. As determined by the Commissioner, petitioner's taxable income for her 1981 and 1982 taxable years equals one-half of the gross income reported by Robert on his returns for those years, less one-half of the itemized deductions and one-half of the personal exemptions claimed on Robert's returns. In determining petitioner's taxable income for her 1983 taxable year, the Commissioner generally took the same approach. However, the wages and unemployment compensation for which the Commissioner determined petitioner to be liable included one-half of certain items of wage and unemployment compensation that the Commissioner determined Robert to have received during 1983, but that were apparently not reported by Robert on his 1983 income tax return. Petitioner has not objected to such inclusion.
[2]↩ This "4,322.60" figure appears to reflect an arithmetic error. The correct amount should have been "4,272.60".
3. The record is unsatisfactory as to the source of these downpayments. In a deposition taken in 1989 pursuant to his bankruptcy proceeding, Robert testified that the funds came from his daughters' "finances". He identified the source of such "finances" as "birthdays, gifts, monies they'd got from their deceased grandmother." However, the testimony given by Robert in this deposition with respect to the circumstances surrounding the receipt of these funds was so vague as to cast serious doubt on whether the daughters actually had such funds available for use in purchasing the Indiana residence.↩
4. SEC. 1034. ROLLOVER OF GAIN ON SALE OF PRINCIPAL RESIDENCE. (a) Nonrecognition of Gain. -- If property (in this section called "old residence") used by the taxpayer as his principal residence is sold by him, and, within a period beginning 2 years before the date of such sale and ending 2 years after such date, property (in this section called "new residence") is purchased and used by the taxpayer as his principal residence, gain (if any) from such sale shall be recognized only to the extent that the taxpayer's adjusted sales price (as defined in subsection (b)) of the old residence exceeds the taxpayer's cost of purchasing the new residence. ↩
5. Under sec. 1034(a), gain on the sale of the taxpayer's principal residence must be recognized to the extent that the adjusted sales price of the old residence exceeds the taxpayer's cost of purchasing the new residence. The gain on the sale of the California property equaled the net amount realized on the sale ($ 95,500) minus the basis of the property ($ 45,000), or $ 50,500. The adjusted sales price of the old residence was $ 95,500, while the cost of the new residence to petitioner and her husband was only $ 55,000. In short, sec. 1034(a) would render nonrecognizable only that portion of the $ 50,500 gain that exceeds $ 40,500 (i.e., $ 95,500 minus $ 55,000), or $ 10,000. Petitioner's one-half share of that $ 10,000 equals $ 5,000, which, when reduced by the 60 percent capital gain deduction, amounts to $ 2,000. Thus, if sec. 1034(a)↩ were applicable, as contended by petitioner, her final entire net share of the gain, as determined by the Commissioner ($ 10,100), would remain taxable except for the $ 2,000 nonrecognizable portion.
6. The "amount of tax required to be shown on the return", upon which the amount of the sec. 6651(a)(1) addition to tax is based, is reduced by the amount of tax paid on or before the date prescribed for payment of the tax and by the amount of any credit against the tax which may be claimed on the return. Sec. 6651(b)(1). In 1982, Robert had $ 272 withheld in partial satisfaction of his Federal income tax liability for that year, and the Commissioner treated petitioner as having paid one-half of this amount for purposes of determining the "amount of tax required to be shown on the return". Id. Thus, the Commissioner determined that the amount of the addition to tax pursuant to sec. 6651(a)(1)↩ equaled 25 percent of $ 2,615 rather than 25 percent of $ 2,751. 7. For purposes of this case, the "underpayment" for each taxable year at issue is simply the deficiency for that year as defined in sec. 6211. See sec. 6653(c)(1)↩.