In re Nirwana NORONHA, Debtor.

No. 06–33325.

United States Bankruptcy Court,
W.D. Kentucky.

Dec. 5, 2007.

Christy J. Adams, Louisville, KY, for Debtor.

## ORDER OVERRULING DEBTOR'S OBJECTION TO CLAIM OF INTERNAL REVENUE SERVICE

THOMAS H. FULTON, Bankruptcy Judge.

THIS CORE PROCEEDING[1] comes before the Court on an Objection to Claim of Internal Revenue Service ("Objection") filed by Nirwana Noronha, the debtor in this bankruptcy case ("Debtor"), objecting to a civil penalty assessed against her by the Internal Revenue Service ("IRS") for her failure to ensure payment of withholding taxes by Internal Data Group, Inc. ("IDG"), a closely held corporation for which the Debtor was a shareholder and secretary-treasurer. Specifically, the Debtor objects on grounds that she was not responsible for collecting and paying IDG's withholding taxes as directed by 26 U.S.C. § 6672(a), and, accordingly, she is entitled to a determination under 11 U.S.C. § 505(a) that she is not liable for the tax penalty. This Court denies the Debtor's objection because she failed to prove by a preponderance of the evidence that the IRS assessment identifying the Debtor as a responsible person who willfully failed to collect and pay IDG's withholding taxes was incorrect.

## FINDINGS OF FACT

The Debtor filed a Chapter 13 bankruptcy petition on November 13, 2006. The IRS filed a proof of claim on January 8, 2007, asserting a claim against the Debtor in the amount of $170,221.81 for a trust fund recovery penalty that was assessed against the Debtor on April 30, 2001, by a delegate of the Secretary of the United States Treasury pursuant to 26 U.S.C. § 6672.

The penalty arose from the operation of IDG, a technical personnel staffing agency owned and operated by the Debtor, her husband David Noronha[2] ("David"), and other parties at various times since its incorporation in Bunker Hill, Michigan, in

---

1. 28 U.S.C. § 157(b)(2)(B).

2. The Debtor and David Noronha were legally separated in 2000.

1988. At the time of IDG's incorporation, the Debtor and David were its sole shareholders. The Debtor is educated: she holds a bachelor's degree in sociology and a computer programming diploma from two different universities in India. While living in Michigan, the Debtor was employed on a full-time basis by Mercy Health Services as a computer programmer.

In March 1990, David and the Debtor traveled to Louisville, Kentucky, to reorganize IDG into a new partnership with Kent Wicker, Ron Zolkowich,[3] and Fred Cox as new shareholders and directors ("New Shareholders").[4] The New Shareholders were elected as directors of IDG at a meeting of shareholders in 1990. IDG retained its original corporate office in Michigan but moved its bank account to Louisville, and the New Shareholders controlled the account at that time. Under the agreement, the New Shareholders acquired a total of 50% of IDG's shares in exchange for marketing and personnel placement services; no money was exchanged. Zolkowich was primarily responsible for IDG's financial affairs.

In July 1992, the Debtor and David moved to Louisville. Upon relocating to Louisville, the Debtor was employed on a part-time basis by Our Lady of Peace Hospital until November 1993. In 1996, the Debtor took a full-time job as a contract computer programmer with William and Mercer. She has remained an employee of William and Mercer or its successor, ADP, to the present.

In June 1999, the Debtor and David entered into a stock redemption agreement with the New Shareholders under which they repurchased the other half of IDG's stock from the New Shareholders for $500,000, making the Debtor and David its sole shareholders. Pursuant to the redemption agreement, the New Shareholders retained their respective roles in IDG's business operations for the year following the buyout—until June 2000. The Debtor and David were to complete the terms of the buyout by October 2000.

Beginning in 1999, around the time of the stock redemption agreement, the Debtor and David made a series of loans or money transfers to IDG in an effort to address cash flow problems. They transferred roughly $45,000 from a bank account held jointly by them in the summer of 1999. They took out an equity line of credit on their home with a limit of $140,000 and transferred the entire amount to IDG in October 1999. The Debtor loaned IDG roughly $18,000 from her 401(k) plan in June 2000. At some point in the summer of 2000, David transferred $50,000 to IDG from a Merrill Lynch account that was jointly owned with the Debtor. In August 2000, the Debtor and David cosigned on a revolving line of credit from PNC Bank ("PNC Credit Line") for $350,000 that was secured by IDG's accounts receivables.

Despite these transfers, IDG's cash flow problems persisted. Ultimately, IDG did not pay its withholding taxes for the second or third quarters of the year 2000. Rose Drennan ("Drennan"), a technical services advisor for the IRS, testified that the assessment for the second quarter of 2000, ending June 30, was $111,395.89, and the assessment for the third quarter of

---

3. The Debtor's Proposed Findings of Fact and Conclusions of Law spell this name "Ron Zolkiewicz." This Court will use the spelling "Zolkowich" as it appears in the official transcript for this hearing.

4. It is unclear whether a partnership was actually formed or whether these parties were primarily brought in as shareholders and directors.

2000, ending September 30, was $20,868.67. The total outstanding tax amount was $132,264.56. Drennan also testified that, pursuant to IRS policy, a field revenue officer investigated IDG's unpaid taxes and determined that the Debtor and David were both responsible for collecting the withholding taxes under 26 U.S.C. § 6672(a). This determination was made based on a variety of financial records, *e.g.*, bank statements, who were signatories on the bank account signature cards, who signed IRS Form 941, and inquiries made with third parties by the IRS.

On February 4, 2001, in her capacity as secretary, treasurer, and 50% shareholder of IDG, the Debtor called a special board meeting with several stated purposes, including "to review the strategy and business plan of [IDG]," "to obtain a status on the issue of delinquent Federal Payroll Taxes," and "to obtain details relating to any Payroll and Payroll Tax discrepancies which could impact [the Debtor] in her capacity as Secretary and Treasurer." Additionally, the Debtor made very specific requests for various financial records relating to IDG. The special board meeting was held on February 16, 2001. David became upset with the Debtor for calling the meeting and allegedly ordered her to leave the premises at one point during the meeting. At the end of this meeting, the Debtor handed David a letter formally resigning as secretary-treasurer of IDG. On this same date, however, the Debtor signed a signature card for IDG's bank account that gave her check writing authority on the account.

As of April 30, 2001, the tax due was $121,912.43, which represents the original tax assessed and any associated fees accrued, less any credits for, *e.g.*, payments sent, levies made against IDG's accounts, or income tax refunds withheld that were otherwise due to the Debtor or David. The $170,221.81 proof of claim filed by the IRS is for the remaining tax due, penalties assessed, and interest that has accrued from the date of the assessment.

The facts as stated above were more or less undisputed. Testimony offered by the Debtor and David regarding the Debtor's involvement in IDG and her responsibility for the unpaid taxes, however, varied substantially from the facts presented by the IRS. The Debtor and David testified during direct examination at trial that the Debtor's role in IDG's business operations was minimal and any documented actions she took on behalf of IDG since its incorporation were taken unquestioningly by her at David's direction. According to the Debtor and David, despite being the named secretary-treasurer when IDG was incorporated in 1988, the Debtor was never involved in any decisions regarding the fate of the company: she never received any certificate evidencing her shares in IDG; she never attended any organizational meeting; she never participated in any vote to adopt bylaws or elect directors or officers of IDG; she was never included in any discussion or meeting to approve the sale of one-half interest of IDG to the New Shareholders in 1990; she was never included in any discussion regarding the stock redemption agreement in 1999; and she was never involved in any of the business decisions or day-to-day operations of IDG during the second and third quarters of 2000, when IDG's withholding taxes were not paid. David testified that he, his brother Christopher Noronha ("Christopher"), and Frank Monetary[5] ("Mone-

---

5. The Debtor's Proposed Findings of Fact and Conclusions of Law spell this name "Frank Mancioni." This Court will use the spelling "Monetary" as it appears in the official transcript for this hearing.

tary") were the only people involved with IDG's day-to-day business operations after the Debtor and David executed the stock redemption agreement.

When questioned at trial about how the Debtor's signature appeared on numerous loan documents, bank account signature cards, tax forms, or IDG corporate checks, the Debtor or David explained that, in every instance, she signed her name on any document relating to IDG at David's instruction without understanding or demanding an explanation as to the nature or effect of the documents. According to the Debtor's testimony, sometime in 2000 David informed the Debtor of IDG's cash flow problems in the course of obtaining funding to try to improve the company's financial outlook. When the Debtor pushed David for more details, however, he refused to explain IDG's financial woes in any detail.

According to the Debtor's and David's testimony, every time a transfer was made from one of their personal accounts, the home equity line of credit, or even the loan from her 401(k), David would take the money and use it for IDG's benefit without any input from her. Likewise, they testified that when David transferred money from the Merrill Lynch account to IDG, he did so without her input, and he told the Debtor only that he would repay the money somehow. The Debtor testified that, though her name did appear on the signature card for the PNC Credit Line, she was required to sign the card because she was a cosigner on the loan. She argued that her signature on the signature card was not indicative of any actual authority she exercised with respect to credits

against the account or to IDG's finances in general.

Through exhibits and impeachment of the Debtor and David's direct testimony, the IRS presented evidence that the Debtor was involved with IDG's business operations during the second and third quarters of the year 2000 as well as subsequent periods during which the Debtor had the authority or ability to cause repayment of the outstanding taxes. Despite the cohesiveness of the Debtor's and David's testimony during their respective direct examinations, they equivocated when cross-examined about the Debtor's role in IDG's financial operations.

The IRS entered an exhibit entitled "Report of Interview with Individual Relative to Trust Fund Recovery Penalty or Personal Liability for Excise Tax," IRS Form 4180 ("Form 4180").[6] The Debtor was the only name listed on Form 4180 as the "Person Interviewed." Among the information Form 4180 contained regarding the Debtor's role in the company was the following: she was the secretary/treasurer; she had an undisclosed amount of money invested in the corporation; she had not had her name removed from bank signature cards; she was a 50% shareholder in IDG; she was authorized to "sign/countersign corporate checks" and "Guarantee cosign corporate bank loans," and, significantly, "Review federal income tax returns." Additionally, the following handwritten declarations appeared on Section III of Form 4180 (entitled "Knowledge"):[7] (a) the Debtor first became aware of the delinquent taxes in "April 2000"; (b) the Debtor had "assisted with business plan involving growth quotas and cash flow projections"; (c) discussions or meetings were

---

6. IRS Form 4180 is generally completed either by an IRS revenue officer while interviewing witnesses or submitted by taxpayers through their powers of attorney to the IRS.

7. The language in quotations represents the handwritten responses to printed questions on Form 4180.

held by stockholders, officers, or other interested parties regarding the nonpayment of the taxes at which "David and [the Debtor]" were present on June 5, 16, and 17, 2000, and July 15, 21, 23, and 24, 2000;[8] and (d) financial statements for the corporation were prepared by, reviewed by, or submitted to "David and [the Debtor]" on December 1999, March 2000, and September 2000. Furthermore, a response on the Debtor's Form 4180 stated that, during the time the delinquent taxes were increasing, or at some time thereafter, "payroll and operational obligations" were paid for the benefit of the corporation. A response on the form stated that the PNC Credit Line was a source of funds to pay net corporate payrolls. Lastly, a response on Section V of Form 4180 (entitled "Additional Comments") stated that there was no one else who may have been involved or who could provide additional information regarding the delinquent taxes.

A declaration appears on Form 4180 above the line bearing the Debtor's signature which reads: "I declare that I have examined the information given in this statement and, to the best of my knowledge and belief, it is true, correct and complete." The Debtor testified that she did not complete the form; rather, David brought her the form and she merely signed it at his direction. David testified that he delegated preparation of Form 4180 to Monetary, and after its completion David had the Debtor sign the document. The Debtor signed Form 4180 on November 3, 2000.

The Debtor's testimony regarding declarations made on Form 4180 cast a pall on her veracity. Despite her acknowledgment that she made the declarations on Form 4180 by signing the document, the Debtor testified during direct examination that she did not review the information on the form before she signed it and that the information David had entered thereon was incorrect. When questioned about this assertion, the Debtor wavered on her testimony, stating that she "may not have reviewed every line of [Form 4180]." When pressed further about this inconsistency in her testimony, the Debtor stated that it was "possible" that she reviewed the information on Form 4180 before she signed it. Moreover, the IRS attorney impeached the Debtor with testimony she offered during a deposition conducted by the IRS six weeks before the hearing ("IRS Deposition") that it was, in fact, her regular practice to review documents before she signs them.

There were several other facts established at trial that further assail the Debtor's credibility. Her name was added to the IDG bank account sometime around August 2000, which coincides with the date that Ron Zolkowich, who had been responsible for IDG's financial operations prior to that, concluded his services for IDG under the stock redemption agreement. Although the Debtor denied having been involved with IDG's finances or having any responsibility for the non-payment of the withholding taxes, she testified during IRS Deposition six weeks earlier that her name was added to the IDG bank account because she "want[ed] to be able to see and sign checks and approve, have some control" to try to remedy the tax delinquency problem. The addition of the Debtor's name to the bank account suggests a more active role than the Debtor would admit on direct examination, and, furthermore, it makes more dubious the Debtor's claims that David declined her every effort to become more informed about IDG's financial state. Moreover, the

8. Although a response on Form 4180 indicated that minutes were available from at least one of those meetings, none were ever produced at trial.

signature card for the PNC Credit Line was revised in February 2001 to remove Christopher's name, but the Debtor's and David's names were retained on the card. That the signature card would be revised to remove Christopher's name but retain the Debtor's also belies her depiction of her role in IDG as uninvolved.

In many other instances at trial, the Debtor's or David's testimony during direct examination was unequivocal, only to be firmly impeached during cross examination by inconsistent statements made during the IRS Deposition conducted six weeks before the trial or by declarations the Debtor made on Form 4180. For example, despite her testimony during trial that she first learned that IDG had failed to pay its withholding taxes in November 2000, the Debtor declared on Form 4180 that she first learned of the outstanding taxes in April 2000—in the first month of the second quarter of 2000. Despite her statement that she was completely uninvolved with IDG's business operations, the Debtor declared on Form 4180 that she "assisted with business plan including growth quotas and cash flow projections" as action taken "to see that the tax liabilities were paid."

Additionally, despite her testimony during trial that she never attended any meeting with IDG shareholders, officers, or directors after the stock redemption by the New Shareholders and prior to the February 16, 2001, meeting of directors that she called, the Debtor declared on Form 4180 that she and David attended a total of seven meetings "held by stockholders, officers or other interested parties regarding the non-payment of the taxes." When pressed about the inconsistencies between her declarations on Form 4180 and her testimony on direct examination, the Debtor stated: "If it [sic] had a meeting, it was not specifically about payroll taxes. It was about cash flow." This concession directly refutes her earlier testimony that she was not involved with IDG's business operations in any way.

The record and the trial transcript are replete with other inconsistencies in the Debtor's or David's testimony which, in the aggregate, repudiate the Debtor's efforts to depict herself as an uninformed and unsophisticated spouse holding official roles or taking official actions on behalf of her husband's company only because she was instructed to do so. The Debtor stated during direct examination that she did not consider multiple transfers from their personal bank accounts or from her 401(k) account as "loans" because David simply took the money unilaterally. Once testimony given by the Debtor during her IRS Deposition showed her referring to these various transfers as "loans" was read into the record for impeachment purposes, however, the Debtor equivocated, questioning what the attorney for the IRS meant by "loan" and whether the formal elements of a "loan" were present with respect to the transfers of property from the Debtor to IDG.[9]

---

9. The Debtor testified at this point in the hearing:

> Again, I want to clarify. When you say a loan, what, exactly, do you mean—a loan? Did I sign a promissory note? Was there a note from IDG? In none of these cases, was that the situation. The money was taken, saying, "I'll give it back to you," and that was it.
>
> . . . .

> To me, a loan is a formal document from a formal bank or some—between two individuals. I'm sorry, it's just, "Okay, I borrowed the money. I'm going to give it back." If that's what you're terming as a loan, that's—in the general sense, that was not what I meant. It was money was taken, and it was said, "I'll give it back." To me, that's a loan. I'm going to give $5 to someone, that's a loan, too, but there's no

Among her testimony at trial in October 2007, her testimony at the IRS Deposition six weeks before trial, her responses to the IRS interrogatories and IRS requests for admissions on June 7, 2007, and her statements on IRS Form 4180, signed on November 3, 2000, the Debtor gave inconsistent statements regarding whether she had check signing authority on IDG corporate accounts and when she first learned of IDG's tax delinquency.

For example, the Debtor stated in her responses to interrogatories that "for some time periods [the Debtor] was authorized to sign IDG checks but that she was not authorized to sign IDG checks during the time period 12/29/99–2/16/01.... To the Debtor's knowledge, the only documents reflecting such check writing authority are the PNC Bank signature cards." Yet the Debtor had check signing authority as of August 2000, and she signed at least eight IDG checks between September 2000 and the end of December 2000. Moreover, she was the payee on all eight of those checks that bore her signature. Likewise, her declarations on Form 4180 state that she had check signing authority on IDG's accounts. When questioned why she falsely stated that she did not have check signing authority, the Debtor explained that she did not remember that she had signed the signature card. When questioned why she falsely stated that she had never signed any IDG checks, she likewise explained that she did not remember signing her name to any checks on the account because David had instructed her to sign the checks the same day she signed the agreement for the PNC Credit Line. On cross examination, the Debtor stated that between August 2000, when she obtained

check writing authority, to May 2001, when she ceased to have check writing authority, she did not make any payments to the IRS to pay the outstanding taxes once she learned that they were owed because she did not know where the checkbook was. When asked why she did not call the bank and direct the bank to transfer funds to the IRS, she stated that she "didn't think of it that way."

The Debtor's statements during direct examination and in her responses to interrogatories also conflict with her earlier declarations on Form 4180 regarding her authority to review tax documents and her knowledge of the tax deficiency. Although her declarations on Form 4180 stated that she could review federal income tax returns, the Debtor averred in her responses to interrogatories that she lacked authority to review tax documents. Although her declarations on Form 4180 stated that she learned of the tax deficiency in April 2000, the Debtor averred in her responses to requests for admissions that she did not know about IDG's tax deficiency since April 2000. Likewise, between September 2000 and October 2001, the Debtor repeatedly received and redeemed checks from IDG as repayment for the loans she made from accounts owned by her or jointly by her and David. During cross examination, she admitted that she knew IDG owed back payroll taxes when she redeemed the checks from IDG.

Another piece of evidence that casts doubt on the Debtor's purportedly limited role in IDG's operations is a mediation agreement the Debtor and David entered

document or no amortization schedule. So I'm sorry if I said it was a loan. It was money that was taken from my account. In the Court's view, the fact remains that she had no difficulty characterizing the transfers

as "loans" during the IRS Deposition six weeks earlier. For this reason, her equivocations and evasive testimony contribute to cast her credibility in an unfavorable light.

into on March 6, 2001.[10] Under the terms of this mediation agreement, David would take complete control of IDG and, after drawing a salary for his operation of the business, pay all profits to creditors and the IRS. The Debtor would not participate in the business operations at all. As consideration for the Debtor surrendering her interest in IDG, David would indemnify her for all debt on which she became liable for the benefit of IDG in the previous years. Also under the mediation agreement, if David was determined psychologically incapable of operating IDG, the Debtor would take complete control of IDG under the same conditions, and David would not participate in the business operations at all. Neither party would pay maintenance to the other under this mediation agreement, and custody of their minor child would be shared barring a determination of psychological unfittedness.

The Court deduces from the terms of this agreement that the Debtor's role in IDG prior to the mediation agreement was more than symbolic. Otherwise, why would a mediation agreement be necessary to ensure the Debtor was thereafter uninvolved in IDG's business operations? She had formally resigned as secretary-treasurer of IDG at the February 16th special meeting, so a mediation would be unnecessary to maintain the status quo were it as the Debtor claimed during her direct testimony. Also, if the Debtor had not participated in IDG's finances as she argued, why would a person who had been completely uninvolved with a company's business operations agree to take over a failing business with a history of cash flow problems? In this Court's opinion, if the Debtor was merely concerned about liabilities that she blindly undertook at David's di-

rection, she would not consent to the provision in the mediation agreement handing her the reins of IDG if David was determined incapable of operating the company, because (according to the Debtor's story) that would simply be passing control of IDG from one incapable party to another. This mediation agreement more logically reflects a business relationship between the Debtor and David that had begun to crumble along with their marriage and a transfer of complete ownership and operational responsibilities of IDG to one of the parties in return for indemnification of the debts accrued for benefit of IDG as consideration.

The Debtor's claims that she was not involved with IDG's financial operations were even refuted by a representative for Chilton and Medley, an accounting firm that did work for IDG in 2000 and 2001. Stephen Lukinovich ("Lukinovich"), a certified public accountant with Chilton and Medley, testified that on February 14, 2001, he provided the Debtor with IDG's balance sheet and income statements for the first nine months of 2000. Furthermore, Lukinovich testified that he remembered having other conversations with the Debtor within roughly two months prior to February 2000 regarding IDG's financial state, but he could not remember exactly when the conversations occurred. Lukinovich testified that he would have provided the Debtor with any financial information relating to IDG if she had requested it. Lukinovich's testimony that he had several conversations with the Debtor within the months leading up to the February 16th special board meeting conflicts with the Debtor's assertions that she was uninvolved with IDG's business dealings and was kept uninformed of IDG's financial

---

**10.** This agreement was filed in the Jefferson Circuit Court Clerk's office on March 12, 2001.

status during the period for which she had check writing authority.

Other aspects of David's testimony were also unbelievable. Conveniently for the Debtor, he was able to recollect virtually nothing relevant to IDG's financial woes as it related to her. His testimony throughout cross-examination was exceedingly resistant, even as to the most basic facts, including whether the Debtor was a director, secretary, and 50% shareholder of IDG. David had to be impeached on the witness stand with testimony he offered during the IRS Deposition six weeks earlier because he refused to concede even the most trivial details about IDG's organization. His elusiveness was punctuated with an impotent attempt to assail the validity of the deposition transcript from which he was impeached [11]—a maneuver that served no apparent purpose other than stonewalling.

Furthermore, and most unbelievably, David testified that he was only familiar with the Debtor's signature "to a certain extent" despite having been married to her for over twenty years—a concession he made only after being pressed about whether he recognized the Debtor's signature on an IDG check. This testimony, though questionable on its own, was especially astonishing in contrast to his unhesitating testimony minutes earlier that he was able to recognize Frank Monetary's handwriting on another document despite only knowing Monetary since 1999 at the earliest.

In the Court's view, this exhaustive and laborious recitation of the facts as it appears in this opinion is necessary to illustrate this perpetual undercurrent to the testimony or statements offered by the Debtor or David during trial or in other documents of record: the Debtor and David lack credibility. Their testimony and their elusive responses to earlier statements or declarations appear to be self-serving and calculated to avoid liability for the unpaid withholding taxes during the second and third quarters of 2000, when the Debtor was secretary, treasurer, and 50% shareholder of IDG.

Of course, were the Debtor's or David's justifications for these inconsistencies true despite their evasiveness, their accounts of the events and time periods in question could have easily been corroborated by testimony of one of the other parties involved with IDG during this time. The Debtor, however, did not call Christopher Noronha, Frank Monetary, or any of the New Shareholders that had been involved with IDG between 1990 and 1999 to testify regarding the Debtor's involvement (or lack thereof) with the operation of IDG. This is especially significant with respect to Monetary in light of David's testimony that Monetary prepared the IRS Form 4180 that the Debtor signed. Likewise, Christopher's testimony would have been beneficial to the Debtor's cause in light of

---

11. David stated during cross examination that he had not been given an opportunity to review the transcript of the IRS Deposition to ensure its accuracy and that his attorney had instructed him that the deposition was not valid if he had not reviewed it. Presumably, the Debtor was referring to Kentucky Rule of Civil Procedure 30.05, which provides a means for a deponent to review his deposition testimony for accuracy when a written request was made to the official taking the deposition. David objected to the use of the deposition for impeachment because he claimed he had not been given the opportunity to review it. Notwithstanding that David did not state whether he had actually made a written request, he subsequently conceded to the Court that a review would not have revealed any inaccuracies because he was unable to remember anything about which he was questioned (and would thus be unable to identify any possible inaccuracies in the transcript).

David's testimony that Christopher was "second in command," yet Christopher was not called as a witness and no testimony was offered as to why. Without any corroboration from more reliable witnesses, the testimony offered by the Debtor and David remains flimsy.

## CONCLUSIONS OF LAW

The Debtor objects to the IRS's otherwise nondischargeable claim, disputing the tax assessment levied by the IRS based on IDG's unpaid payroll taxes for the second and third quarters of 2000. This Court has jurisdiction under 11 U.S.C. § 505(a), which provides that a bankruptcy court "may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction."

An employer must withhold a certain amount of each of its employee's wages for taxes attributable to that employee and hold them in a special fund in trust for the United States. 26 U.S.C. §§ 3102, 3402, & 7501. 26 U.S.C. § 6672(a) states in pertinent part:

(a) **General rule.**—Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over....

These provisions imposed upon IDG the duty to withhold payroll taxes from its employees' wages to pay to the IRS.

■ There are two elements for liability under 26 U.S.C. § 6672(a): (1) the taxpayer is a "responsible person" within the meaning of the statute; and (2) the taxpayer "willfully failed" to pay the taxes due. *Kinnie v. United States,* 994 F.2d 279, 282–83 (6th Cir.1993); *McDermitt v. United States,* 954 F.2d 1245, 1250 (6th Cir.1992); *Gephart v. United States,* 818 F.2d 469, 473 (6th Cir.1987). The statutory definition of the word "person" is broad and is not limited to acting officers or directors of a corporation. *Mueller v. Nixon,* 470 F.2d 1348, 1350–51 (6th Cir. 1972).

■ The test for determining who is a "responsible person" is functional, "focusing upon the degree of influence and control which the person exercised over the financial affairs of the corporation and, specifically, disbursements of funds and the priority payments to creditors." *Gephart v. United States,* 818 F.2d at 473. Factors a court may rely on in making this determination are (1) the duties of the officer as set forth in the corporate bylaws; (2) the person's authority to sign corporate checks; (3) the identities of the officers, directors, and shareholders of the corporation; (4) the identity of the people in charge of hiring and firing employees; (5) the identity of the individuals who controlled the financial affairs of the corporation. *Gephart,* 818 F.2d at 469 (citing *Braden v. United States,* 318 F.Supp. 1189, 1194 (S.D.Ohio 1970)). Under 26 U.S.C. § 6672, more than one person can be a "responsible person" with respect to a corporation; "liability is predicated upon the existence of significant, as opposed to absolute, control of the corporation's finances." *Gephart,* 818 F.2d at 469 (citing *United States v. Davidson,* 558 F.Supp. 1048, 1054, 1055 n. 5 (W.D.Mich.1983)).

■ The "willfulness" element under 26 U.S.C. § 6672 is present "if the responsible person had knowledge of the tax delinquency and knowingly failed to rectify [the delinquency] when there were available funds to pay the government." *Gephart*, 818 F.2d at 473; *see also McDermitt v. United States*, 954 F.2d at 1251. The Debtor need not have acted with an intent to defraud under § 6672; a decision to use company funds to pay debts owed to other creditors instead of paying the withholding taxes due to the IRS constitutes a "willful failure to pay" under the statute. *Bloom v. United States*, 272 F.2d 215, 223 (9th Cir.1960); *see also Braden v. United States*, 442 F.2d 342, 344 (6th Cir.1971) ("If the Appellant was aware of the fact that the taxes were unpaid, and, possessing the power and responsibility to pay them, failed to do so, then he is liable for the penalty of section 6672 notwithstanding his lack of malice or wrongful purpose.").

■ The burden of proof in a tax collection suit is significant. In a suit to collect taxes, the IRS bears the burden of proof. *United States v. Stonehill*, 702 F.2d 1288, 1293 (9th Cir.1983). The IRS can carry its burden, however, by introducing its assessment of the tax due that is supported by a "minimal evidentiary foundation." *United States v. Stonehill*, 702 F.2d at 1293. A tax assessment by the IRS is entitled to a legal presumption of correctness.

> An "assessment" amounts to an IRS determination that a taxpayer owes the Federal Government a certain amount of unpaid taxes. It is well established in the tax law that an assessment is entitled to a legal presumption of correctness-a presumption that can help the

Government prove its case against a taxpayer in court.[12]

*United States v. Fior D'Italia, Inc.*, 536 U.S. 238, 242–43, 122 S.Ct. 2117, 2122, 153 L.Ed.2d 280 (2002) (citing *United States v. Janis*, 428 U.S. 433, 440, 96 S.Ct. 3021, 3025–26, 49 L.Ed.2d 1046 (1976); *Palmer v. IRS*, 116 F.3d 1309, 1312 (9th Cir.1997); *Psaty v. United States*, 442 F.2d 1154, 1160 (3d Cir.1971); *United States v. Lease*, 346 F.2d 696, 700 (2d Cir.1965)); *see also Stonehill*, 702 F.2d at 1293. Once the IRS introduces a presumptively correct tax assessment, the burden of proof shifts to the taxpayer to prove by a preponderance of the evidence that he or she was not a responsible person who willfully failed to pay the withheld taxes to the IRS. *McDermitt*, 954 F.2d at 1251; *Collins v. United States*, 848 F.2d 740, 742 (6th Cir.1988); *Gephart*, 818 F.2d at 473; *United States v. Molitor*, 337 F.2d 917, 922 (9th Cir.1964).

■ In the case *sub judice*, the IRS submitted an assessment that found the Debtor to be a responsible person who willfully failed to pay the taxes due for IDG. This assessment was supported by evidence submitted by the IRS. Form 4180, signed by the Debtor, contained declarations on pages five and six that she was secretary-treasurer of IDG during the second and third quarters of 2000; that she had the authority to sign checks for IDG and, thus, issue checks to the IRS to pay the tax deficiency; that she had authority to review tax documents; that she knew of the tax deficiency as early as April of 2000; and that she had been involved with meetings in an effort to address the tax delinquency. The IRS also submitted proof that the Debtor accepted checks from IDG, establishing that there

---

12. This presumption is necessary to facilitate recourse against the employer—imperative for the IRS, because the "taxes withheld [from the employees' paychecks] are credited to the employees regardless of whether they are paid by the employer." *Slodov v. United States*, 436 U.S. 238, 243, 98 S.Ct. 1778, 1783, 56 L.Ed.2d 251 (1978).

376

were some funds available to pay the delinquency. The Debtor signed Form 4180 immediately below boldface print that announced that any signature would constitute a declaration that the signatory had read the contents before signing and that the information was accurate. The Debtor had stated that it was generally her practice to read documents before she signed them. Furthermore, the Debtor is educated, and her other written communications of record, *e.g.*, her letter calling the special meeting of directors, do not appear to be the products of an unsophisticated individual. Because the declarations on these forms were made by the Debtor before the tax collection efforts had been initiated by the IRS, this Court finds the Debtor's statements made therein more credible than her statements made during trial, when she had a motive to depict as minimal her involvement in IDG.

■■■■ Even taking the Debtor's unconvincing testimony as true, "the fact that the plaintiff spent no time with the corporation is not a defense, since delegation will not relieve one of responsibility; liability attaches to all those under the duty set forth in the statute." *Cooper v. United States,* 827 F.Supp. 1309, 1314 (E.D.Mich. 1993), *aff'd,* 66 F.3d 325 (6th Cir.1995). By her own testimony and actions, the Debtor knew of the tax liability by November 2000. She was still acting secretary-treasurer of IDG at this time, and she had the authority to write checks on IDG accounts. Likewise, she was provided with financial information regarding IDG during this period. While vested with this authority and being duly informed of the tax liability, the Debtor "knowingly failed to rectify [the nonpayment] when there were funds available to pay it." *Gephart,* 818 F.2d at 475. Moreover, assuming *arguendo* that she did not learn of the tax liability early enough to rectify it, the Debtor's repeated failure

to ask questions, demand information, and review documents relative to IDG's financial state while she was secretary-treasurer constitutes, in this Court's view, a reckless disregard for her duties under 26 U.S.C. § 6672. "Courts have ... determined that one who acts with a reckless disregard for obvious or known risks will be considered to have acted 'willfully' for purposes of Section 6672." *Cooper v. United States,* 827 F.Supp. at 1313–14 (internal quotations omitted) (citing *Sorenson v. United States,* 521 F.2d 325, 329 (9th Cir.1975); *Kinnie,* 771 F.Supp. at 852; *Schwinger v. United States,* 652 F.Supp. 464, 470 (E.D.N.Y.1987)). In this Court's view, "any misapprehensions or ignorance [of the tax liability] were largely self-imposed." *Sorenson v. United States,* 521 F.2d at 329.

Because the IRS tax assessment was supported by substantial evidence, the burden shifted to the Debtor to disprove tax liability by a preponderance of the evidence. The Debtor failed to meet this burden at trial. The only evidence on which the Debtor relied in her efforts to disprove tax liability was testimony offered by her and David. Both proved to lack credibility during trial. Counsel for the IRS repeatedly impeached each on the witness stand with inconsistent statements made at the earlier IRS Deposition or in documents generated years earlier. Accordingly, the Debtor has failed to establish by a preponderance of the evidence that she was not a responsible person who willfully failed to pay IDG's withholding taxes.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Debtor's Objection to Claim of Internal Revenue Service is OVERRULED.